United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TORRY SMITH, *et al.*,<br><br>  Plaintiffs,<br><br>     v.<br><br>CITY OF OAKLAND, *et al.*,<br><br>  Defendants.<br>_____/ | No. C-05-4045 EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**<br><br>**(Docket No. 35)** |

       The instant lawsuit arose from a warrantless police search of the Oakland residence of Plaintiffs Torry Smith and Patricia Gray. Mr. Smith was arrested subsequent to this search and incarcerated for over four months. Plaintiffs allege several civil rights violations by Defendants City of Oakland and Oakland police officers, M. Midyett and J. Parkinson. The thrust of Plaintiffs' complaint is that the Oakland officers conspired to plant evidence on Mr. Smith in order to coerce information from him and trump false charges against him. The officers deny all allegations of wrongdoing and contend that they searched Plaintiffs' residence for legitimate law enforcement purposes.

       Currently pending before the Court is Defendants' motion for summary adjudication. In their motion, Defendants ask the Court to dismiss some, but not all, of Plaintiffs' claims. More specifically, Defendants ask that the Court dismiss the Fourth Amendment claim for unlawful search and any claim for post-criminal indictment damages. Defendants further request that the Court dismiss all claims against the City of Oakland and against Officer Midyett. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court

hereby **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary adjudication.

## I.   FACTUAL & PROCEDURAL BACKGROUND

The relevant facts presented by the parties are as follows.

A.   Traffic Stop of Walton and Belton

On September 10, 2004, Officers Parkinson and Midyett made a traffic stop of a car driven by Juanita Walton. Ms. Walton was accompanied by her boyfriend, Marcus Belton, who was known to the police as a dangerous criminal. *See* Parkinson Depo., 27:22-25. The officers found a bank card and some other papers belonging to Mr. Smith in the car. *See id.*, 93:9-13. Mr. Smith had previously reported this card, his social security card, and driver's license missing. *See* Torry Smith's Depo., 27:21-28:25. The officers claim to have not known that Mr. Smith had made such a report. *See* Midyett Depo., 113:18-20. The officers ran Mr. Smith's name through their car computer and learned that Mr. Smith was on parole. *See* Midyett Depo., 78:2-21. They obtained Mr. Smith's contact information from their computer and proceeded to his residence. *See id.* The officers did not seize Mr. Smith's bank card or the other documents they found in the car, nor did they contact the bank that had issued the card. *See* Midyett Depo., 78:9-17. These facts are not disputed. Defendants contend they sought Mr. Smith to determine whether he might be a cohort of Walton or Belton or be a victim. *See* Parkinson Depo., 94:22-95:1.

B.   Search of Plaintiffs' Residence

It is at this juncture that the parties' versions of the events that took place at Plaintiffs' residence diverge.

1.   Defendants' Version

According to Defendants, Officers Parkinson and Midyett knocked on Plaintiffs' door and identified themselves as Oakland police, only to hear the sound of someone moving away from the doorway. *See* Midyett Depo., 93:9-94:25. Officer Parkinson ran to the back of the house and saw Mr. Smith standing outside in the backyard, naked and holding a rifle. *See* Parkinson Depo., 110:15-18. After Mr. Smith put the gun on the ground, Officer Parkinson yelled at Mr. Smith to raise his hands above his head. *See id.*, 111:20-113:18. Officer Midyett heard Officer Parkinson

yelling and came to the back, but Officer Parkinson told him to return to watch the front of the house. *See id.*, 115:7-8.

Officer Parkinson then directed Mr. Smith into the house from the back door and ordered him to lie on the bed to be handcuffed. *See id.*, 116:4-118:3. In the meantime, Officer Midyett had gained entry through the front door. *See* Midyett Depo., 102:19-24. Officer Parkinson informed Officer Midyett about the rifle and went to retrieve it from the backyard. *See id.*, 107:16-19. Officer Midyett radioed for a cover unit and Officer Wells subsequently arrived on the scene, entering the house through the same front door that Officer Midyett had used. *See id.*, 102:8-14., 107:1-10.

After they handcuffed and secured Mr. Smith the Officers told him about finding his bank card and asked him whether he knew Mr. Belton. *See* Parkinson Depo., 141:9-10. Mr. Smith denied knowing Mr. Belton. *See id.*, 141:14-15. However, while being transported to the police station, Mr. Smith spontaneously said that the gun was not his; he and Ms. Gray were just holding the gun for Ms. Gray's brother. *See* Parkinson Depo., 125:19-21. Mr. Smith did not reveal any further information about this brother. *See id.*, 151:21-23. As part of routine investigation, Mr. Smith was also asked whether he had knowledge about any other crimes in Oakland. *See id.*, 142:1-4. According to Officer Parkinson, Mr. Smith admitted to knowing about a murder. Officer Midyett, however, remembered no such admission. *See* Parkinson Depo., 143:4; Midyett Depo., 121:16-122:3. This conversation in the car was not reported by the officers in their official police report -- *i.e.*, the police report did not contain any reference to Mr. Smith's confession that the gun belonged to Ms. Gray's brother, nor did it mention that Mr. Smith admitted to knowing about a murder. Officer Parkinson claimed that he did not include the information about the confession in the report or bring it up at any time until the parole revocation hearing because Mr. Smith had not been admonished when these questions were asked and the officers did not want to use the statements against Mr. Smith in violation of Miranda. *See* Parkinson Depo., 125:22-126:11.

2. <u>Plaintiffs' Version</u>

According to Plaintiffs, Officers Parkinson, Midyett and a third, unknown officer were present during the initial entry of the residence. Officer Parkinson and this third officer simply

kicked open Plaintiffs' back door and found Plaintiffs in the bedroom. *See* Torry Smith Depo., 63:18-24.  The three Officers entered Plaintiffs' home with their guns drawn-- Parkinson and the third officer through the back door and Midyett from the front. *See* Torry Smith Depo., 66:19-67:15. Officer Parkinson and the third officer demanded that Mr. Smith reveal information about Mr. Belton. *See id.*, 71:23-72-25. Officer Parkinson and the unknown officer searched Plaintiffs' residence. *See id.*, 73:1-2. Officer Parkinson then came from the back door and said he had found something, but did not specify further. *See id.*, 78:18-20. Mr. Smith and Ms. Gray thus dispute the officers' version of the search and specifically deny Mr. Smith had possession of a rifle. *See id.*, 40:10-12.

  Plaintiffs' version of the events is corroborated by Mr. Smith's father, Tommie Smith, who lives in the duplex adjoining Plaintiffs' residence.  Tommie Smith was alerted to activity in Plaintiffs' backyard by the loud noise of Plaintiffs' back screen door opening. *See* Tommie Smith Depo., 49:20-50:12. Tommie Smith has a view of Plaintiffs' backyard from his bedroom window. When he looked outside upon hearing the loud noise, he saw two police officers entering Plaintiffs' residence through the back door. *See id.*, 50:12-18. "OPD" was written on the officers' clothes. *See id.*, 50:19-51:11. As Tommie Smith walked to his son's residence to investigate, he saw yet another officer in the front of Plaintiffs' residence. *See id.*, 62:21-23.

  Mr. Smith was taken to the police car by Officers Midyett and Parkinson. On the way to the station they asked Mr. Smith about homicides in the area and told him that, if he provided the information they had been asking for, they would release him. *See id.*, 90:6-20.  Once they got to the station, Officer Parkinson brought Mr. Smith out of the car, while Officer Midyett opened the trunk of the car and retrieved a rifle. *See id.*, 91:25-92:2.  This was the first time Mr. Smith saw the rifle. *See id.*, 92:1-2.  Mr. Smith then became concerned that the officers were trying to plant the rifle on him. *See id.*, 95:10-12.  Mr. Smith's public defender subsequently informed him that he was going to be charged with possession of the rifle. *See id.*, 96:24-97:2.

C. <u>Mr. Smith's Charges and Hearings</u>

  The narrative of Mr. Smith's police report was prepared by Officer Parkinson who was assisted by Officer Midyett. *See* Parkinson Depo., 70:21-25, 101:9-14.  Officer Williams, the

4

weapons charging officer, prepared the case for the district attorney's office. *See* Williams Depo., 29: 11-16. Officer Williams did not discuss the incident with Officer Parkinson or Midyett but relied on their report. *See id.*, 14:19-24. The district attorney, based on the report, decided to press charges. *See id.*, 29:11-16. Mr. Smith was charged with unlawful firearm activity and possession of an assault weapon.

The criminal charges against Mr. Smith were dismissed in two preliminary hearings. At Mr. Smith's parole revocation hearing Officer Parkinson, for the first time, claimed that on the way to the police station, Mr. Smith confessed to holding the gun for his girlfriend's brother. *See* Parkinson Depo., 125:19-126:4. The parole revocation charges were dismissed, and Smith was released after more than four months in custody.

## II. DISCUSSION

A. <u>Defendants' Motion to Strike Plaintiffs' Expert Report</u>

As a preliminary matter, the Court addresses Defendants' motion to strike the expert report of Robert Clark, which Plaintiffs submitted in support of their opposition to the motion for summary adjudication. Defendants assert that the report should be stricken because it is hearsay and because it contains credibility assessments and legal conclusions.

The Court agrees with Defendants that the report should be stricken because it is hearsay. Although the report was signed by Mr. Clark and attached to a declaration of Plaintiffs' counsel (*see* Benjamin Nisenbaum Decl)., the report was not sworn to by Mr. Clark. "Unsworn expert reports prepared in compliance with Rule 26(a)(2) do not qualify as affidavits or otherwise admissible evidence for purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment." 11-56 Moore's Fed. Prac. -- Civ. § 56.14; *see also Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996) (noting that unsworn expert reports are not admissible under Rule 56(e) to support or oppose summary judgment); *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (stating that "[t]he substance of this report was not sworn to by the alleged expert" and so "the purported expert's report is not competent to be considered on a motion for summary judgment.")

B.  Legal Standard for Defendants' Motion for Summary Adjudication

Federal Rule of Civil Procedure 56 (c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  However, the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

C.  Fourth Amendment Claim of Unlawful Search

The parties do not dispute the basic legal principle that parole searches need not be based on probable cause under *Samson v. California*, 126 S. Ct. 2193 (2006).  In *Samson*, a police officer searched petitioner solely on the basis of his knowledge that petitioner was a parolee and recovered a bag of methamphetamine. *Id.* at 2196.  The petitioner attempted to suppress the methamphetamine evidence on the claim that the search was unconstitutional. *Id.*  The *Samson* court applied the Fourth Amendment's "totality of circumstances" approach to examine the California statute which allowed such suspicionless searches. *See id.* at 2197.  Under this approach, individual privacy rights are balanced against legitimate government interests to determine whether a search is reasonable. *See id.*  Applying the balancing test, the Court found California's statute reasonable. *See id.* at 2199.  The government's interest in "integrating probationers back into the community and combating recidivism" outweighed the individual privacy interest. *See id.* at 2197.  The Supreme Court found the California statute was reasonable because the statute did not provide "a blanket grant of discretion untethered by any procedural safeguards," but rather clearly prohibited "arbitrary, capricious or harassing searches." *See id.* at 2202.

6

In *In re Anthony*, 6 Cal. Rptr. 2d 214 (Cal. Ct. App. 1992), a state court defined a search as arbitrary or capricious when it is "unrelated to the rehabilitation and reformative purpose of probation or other legitimate law enforcement purposes." *Id.* at 217. *Anthony* further stated that the evaluation of the nature of the search "must relate to the executing officer's motivation" and noted that a search "motivated by personal animosity" would be arbitrary. *Id.*

The parties agree that the issue for the Court, therefore, is whether there is a genuine dispute of material fact as to whether the entry and search conducted by Officers Parkinson and Midyett was arbitrary or capricious. The Court concludes there is such a dispute of material fact. Defendants contend (and provide evidence) that the search was not arbitrary or capricious because the officers acted to fulfill a legitimate law enforcement purpose. Defendants assert that discovering the bank card alerted the officers to Mr. Smith, that they proceeded to investigate whether Mr. Smith might have been Belton's victim or cohort, and that they entered the house and conducted their search only after Officer Parkinson saw Mr. Smith with the rifle.

Mr. Smith and Ms. Gray both testified in their depositions, on the other hand, that there was no gun on the premises, and their testimony is supported by Tommie Smith's testimony. According to their testimony, the police simply entered for no legitimate reason. They did not investigate the circumstances of the lost credit card before initiating the search. Upon entering, the police tried to coerce Mr. Smith and then planted the rifle. A reasonable jury, viewing the evidence and justifiable inferences in Plaintiffs' favor, could conclude the officers were not earnestly conducting the search for legitimate investigatory reasons and that the gun was planted by the Defendants. If that were the case, the parole search was not for a legitimate law enforcement purpose and would therefore be arbitrary and capricious.[1] This genuine dispute of material fact precludes summary judgment.

---

[1] After Plaintiffs clarified that their Fourth Amendment claim for unlawful search was based on the theory that the search was arbitrary and capricious, Defendants no longer asserted that the officers were entitled to qualified immunity. No argument of qualified immunity was made, *e.g.*, in Defendants' reply brief. To the extent Defendants still make this argument, the Court rejects it. Plaintiffs' version of the facts suggests that the officers planted the rifle and attempted to intimidate and coerce Mr. Smith. Reasonable officers could not have believed that planting evidence is protected under qualified immunity. *See White v. Pierce County*, 797 F.2d 812, 815 (9th Cir. 1986).

1  D.      Claims of Post-Indictment Damages

2      Defendants also contend that Plaintiffs are barred from seeking any damages that accrued
3  after the indictment was filed against Mr. Smith, because "filing of a criminal complaint immunizes
4  investigating officers . . . from damages suffered thereafter because it is presumed that the
5  prosecutor filing the complaint exercised independent judgment in determining that probable cause
6  for an accused's arrest exists at that time." *Smiddy v. Varney*, 665 F.2d 261, 267 (9th Cir. 1981)
7  [hereinafter "*Smiddy I*"]. The exercise of that judgment can break the causal chain, thereby limiting
8  plaintiffs' damages.

9      The above presumption, however, may be rebutted. *See id.* For example, the presumption is
10 rebutted if the plaintiff shows that the prosecutor was pressured by the investigating officers to act
11 contrary to her independent judgment or was presented with information that the officers knew to be
12 false. *See id.* at 266-67. Evidence of material omissions, inconsistent eyewitness accounts, or
13 inconsistent police accounts can rebut the presumption. *See Newman v. County of Orange*, 457 F.3d
14 991, 995 (9th Cir. 2006). While "the presumption may be rebutted in other ways," *id.* at 266-67, the
15 presumption cannot be overcome simply based on the plaintiff's account of the incident. *See id.* at
16 995-96 (stating that "plaintiff's account of the incident in question, *by itself*, does not overcome the
17 presumption of independent judgment") (emphasis added); *Sloman v. Tadlock,* 21 F.3d 1462, 1474
18 (9th Cir. 1994) (noting that plaintiff did not point to any evidence "other than the fact that the
19 officers' reports were inconsistent with Sloman's own account of the incident leading to his arrest"
20 and that "[s]uch conclusory allegations, *standing alone*, are insufficient to prevent summary
21 judgment") (emphasis added).

22     The Court concludes that, in the instant case, there is a genuine dispute of material fact as to
23 whether Plaintiffs are entitled to post-indictment damages because there is evidence that the
24 reporting police officers omitted material facts in presenting the case to the prosecutor thereby
25 preventing him from exercising his independent judgment. In so holding, the Court finds
26 *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) persuasive.

27     In *Blankenhorn*, the plaintiff was arrested by officers at a shopping mall where mall security
28 had issued a written notice evicting and permanently banning him from the premises. *See id.* at 467.

8

The plaintiff was charged with one count of trespass, three counts of resisting arrest, and one count of disturbing the peace. *Id.* All charges against the plaintiff were dropped and he was released, but only after he had spent three months in custody. *See id.* The plaintiff subsequently filed suit for unlawful arrest, excessive force and malicious prosecution (and several California state claims). On the issue of malicious prosecution, the plaintiff claimed that deliberately false statements in the officers' arrest reports led to his three resisting-arrest charges. *See id.* at 482. In bringing these charges, the deputy district attorney did not look at any other evidence and relied on the information in officers' reports. *See id.* at 483. The plaintiff substantiated his claim of that the reports contained material false statements by presenting to the court the deposition testimony of a third-party witness, Garcia. Garcia testified that never during the incident in question did he hear plaintiff claim himself a member of a gang, while the police report by of the officers involved stated that plaintiff had yelled that he was a gang member. *See id.* at 483. In that regard, the case was distinguishable from *Sloman*. "The key fact in *Sloman* was that the plaintiff did not . . . point to any evidence of . . . fabrication, other than the fact that the officers' reports were inconsistent with [his] own account of the incidents leading to his arrest." *Id.* The plaintiff in *Blankenhorn*, however, "provided more than conclusory allegations of the falsehood of [the officer's] statement. Specifically, he supported his motion in opposition with Garcia's declaration." *Id.*

Like the plaintiff in *Blankenhorn*, Plaintiffs in the instant case do not rely solely on their own statements contradicting the officers' accounts in order to assert the police report contains material omissions and false statements to rebut the presumption of independent judgment. As in *Blankenhorn*, in the instant case, a third-party witness, Tommie Smith, has provided testimony that conflicts with Defendants' factual assertions. Tommie Smith heard the back door open only once during the time frame of the incidents in question. On hearing the sound, he looked out of his window into Plaintiffs' backyard and saw the officers entering the house. While Defendants claim that Mr. Smith had run out of the house, naked, to hide the gun, Tommie Smith did not see Mr. Smith when he heard the sound of the back door opening and looked out the window. Rather, he saw two officers enter the house through the back door. Under Defendants' version, the door would have opened twice, once when Mr. Smith ran out with the gun and the second time when Officer

9

1 Parkinson led him back into the house. However, Tommie Smith swears under oath that he heard
2 only one loud sound and saw two police officers entering the house. Tommie Smith's testimony
3 materially corroborates Plaintiffs' version of events and contradicts the officers' version. In
4 addition, the inconsistencies in the officers' testimonies regarding Mr. Smith's alleged admissions
5 while under arrest raises additional credibility issues. As in *Blankenhorn*, the facts viewed in
6 Plaintiffs' favor is sufficient to rebut the presumption of independent judgment, thus warranting
7 denial of summary adjudication.

E.  Claims Against City of Oakland

To prevail on a Section 1983 claim against the City, Plaintiffs must prove that any injury they suffered resulted from City policy or custom. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). The Ninth Circuit has held that in some situations isolated constitutional violations are sufficient to establish a municipal "policy." *See Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). The court elaborated that there are three such situations: if the person causing the violation has "final policymaking authority," *see id.*; if the final policymaker "ratified" a subordinate's actions, *see id.* at 1038; or if the final policymaker acted with "deliberate indifference." *See id.* at 1240.

In the case at hand, Plaintiffs fail to support their claim of policy or custom with any evidence. The only evidence that Plaintiffs have provided in opposing summary judgment is the expert report of Mr. Clark, but for the reasons stated above the report is inadmissible hearsay.

Even if Court were to consider the expert report, Plaintiffs would not prevail. The only argument that Plaintiffs seem to be making via the expert report is that no reasonable supervisor would approve of the police report written by Officer Parkinson. *See* Benjamin Nisenbaum Decl., 2:16-18; Ex. H (Clark Report at 17). Plaintiffs' evidence does not suggest the existence of any of the three situations in which isolated constitutional violations are sufficient to establish a municipal "policy." *See Christie*, 176 F.3d at 1235-40. Plaintiffs do not argue that their constitutional rights were violated by a final policymaker directly; rather, their rights were violated by Officers Parkinson and Midyett. Nor is there any evidence of ratification of the two officers' actions by a final policymaker. As for the argument of deliberate indifference, Plaintiffs fail to establish that the

report was blatantly problematic on its face and should have alerted a reviewing final policymaker of constitutional violations by her subordinates. *See id.* at 1240. For the above reasons, Defendant City of Oakland is entitled to summary judgment on the claim of municipal liability.

F.      Claims Against Officer Midyett

Under Ninth Circuit case law, Officer Midyett may be dismissed from this lawsuit if he is not an "integral participant" in the alleged constitutional violation. *See Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). In *Chuman*, the Ninth Circuit held that an individual police officer could not be found liable under § 1983 for his "team effort" in executing a search warrant when he himself might not be guilty of any constitutional violation. *See id.* The court found it impermissible to "lump all the Defendants together, rather than . . . base each individual's liability on his own conduct." *Id.* at 295.

According to Defendants' version of the facts, Officer Parkinson was the sole participant in the incidents that allegedly violated the Plaintiffs' constitutional rights. Defendants maintain that Officer Midyett remained in the front of the house, never saw Mr. Smith or the rifle in the backyard, and was involved in the alleged violations only to the extent of being present on the scene and later filling out the administrative portions of the police report for Officer Parkinson. However, according to the evidence and inferences viewed in Plaintiffs' favor, even though Officer Midyett did not go to the backyard or enter from the back door, he had was privy to the conspiracy to surprise Mr. Smith by entering his house from both sides, to intimidate him in order to unlawfully extract information, and to fabricate evidence by planting the rifle. If Officer Parkinson had and executed such a plan, it may reasonably be inferred that Officer Midyett knew about it and participated in it. Because there is a genuine issue of disputed fact as to Officer Midyett's role and knowledge, the Court denies summary adjudication.

///
///
///
///
///

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to strike the expert report and grants in part and denies in part Defendants' motion for summary adjudication. Defendants' motion for summary adjudication is granted only to the extent that all claims against the City of Oakland shall be dismissed. The motion is otherwise denied.

This order disposes of Docket No. 35.

IT IS SO ORDERED.

Dated: August 9, 2007

_____
EDWARD M. CHEN
United States Magistrate Judge