**United States District Court**
For the Northern District of California

1
2
3
4
5                          UNITED STATES DISTRICT COURT

6                         NORTHERN DISTRICT OF CALIFORNIA

7

8  TORRY SMITH, *et al.*,                    No. C-05-4045 EMC

9            Plaintiffs,

10      v.                                   **ORDER DENYING DEFENDANTS'**
                                             **MOTION FOR JUDGMENT AS A**
11  CITY OF OAKLAND, *et al.*,               **MATTER OF LAW OR**
                                             **ALTERNATIVELY FOR NEW TRIAL**
12           Defendants.                     **(LIABILITY); AND GRANTING IN**
                                             **PART AND DENYING IN PART**
13  _____/     **DEFENDANTS' MOTION FOR NEW**
                                             **TRIAL AND REMITTITUR**
14                                           **(DAMAGES); AND DENYING**
                                             **PLAINTIFFS' MOTION TO STRIKE**
15
                                             **(Docket Nos. 142-44)**
16

17         In this case, after a vigorously contested trial, the jury concluded that Defendant Officers

18  John Parkinson and Marcus Midyett planted a semi-automatic rifle in Plaintiff Torry Smith's

19  residence in order to frame him.  The jury rendered a verdict in favor of both Plaintiffs -- Mr. Smith

20  and his girlfriend Patricia Gray -- on all counts, finding that Defendants had violated Plaintiffs'

21  constitutional rights as well as their civil rights protected by state law.  Having heard testimony as to

22  the injuries suffered by Plaintiffs, including Mr. Smith's wrongful incarceration for approximately

23  4½ months, the jury awarded Plaintiffs a total of more than $6 million.

24         Currently pending before the Court are two post-trial motions, one focusing on liability and

25  the other on damages, in which Defendants seek to overturn the jury's verdict.  Having considered

26  the parties' briefs and accompanying submissions, as well as the oral argument of counsel and all

27  other evidence of record, the Court hereby **DENIES** the liability motion and **GRANTS** in part and

28  **DENIES** in part the damages motion.

**United States District Court**
For the Northern District of California

## I.   FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs sued Defendant Officers, claiming that their federal and state law rights had been violated when the officers entered and searched Plaintiffs' house, planted an assault rifle on Plaintiffs' premises, and then used the rifle as a basis to arrest Mr. Smith, subjecting him to prosecution and incarceration until his vindication and release 4½ months later.  Defendants vigorously denied that they had planted the weapon and instead contended that they only learned of the rifle when Officer Parkinson saw Mr. Smith walk outside of the house to hide the weapon after being alerted to the presence of the police by Ms. Gray, his live-in girlfriend.  Criminal charges for gun possession brought against Mr. Smith were dismissed after two preliminary hearings in which Defendant Officers testified.  Mr. Smith, who was on parole at the time of the search, was kept in custody after the dismissal until a parole revocation hearing was held on the gun charge.  Officer Parkinson testified at that hearing.  The revocation charge was not sustained despite Officer Parkinson's testimony and Mr. Smith was released.  By that time, Mr. Smith had spent 4½ months in jail.

At trial, both Plaintiffs testified about what took place on the day at issue.  Mr. Smith -- as well as Ms. Gray -- denied having a weapon at the residence.  According to Mr. Smith, Defendant Officers questioned him about a known criminal in whose car Mr. Smith's bank card was found.  It was that bank card that led Defendants to Mr. Smith's residence.  After Mr. Smith denied knowing the individual and knowledge of any other crimes in the area, he was arrested and taken into custody.  According to Mr. Smith, he was questioned about his knowledge of other crimes while in the police car.  It was not until he was booked at the police station that he was informed of the weapons charge.  Defendants conceded at trial that it was not uncommon for them in their investigation of crimes in Oakland to detain individuals subject to arrest, ask them for information about crimes, and then facilitate their release upon their cooperation.  Plaintiffs contend that a rifle was planted on Mr. Smith in order to coerce him into giving information about other crimes, information he did not have.

Plaintiffs presented not only their own testimony in support of their case but also the deposition testimony of Tommie Smith, Mr. Smith's father.  At the time of the incident at issue,

**United States District Court**
For the Northern District of California

1   Tommie Smith lived in a duplex next door to Mr. Smith.  Tommie Smith provided testimony that

2   was corroborative of Plaintiffs' version of the events and contradicted Officer Parkinson's version.

3   According to Tommie Smith, he was alerted to activity in Plaintiffs' backyard by the loud noise of

4   Plaintiffs' back screen door opening.  On hearing the sound, he looked out of his window into

5   Plaintiffs' backyard and saw two police officers enter the house and yell, "There he is."  While

6   Defendants claimed that Mr. Smith had run out of the house, naked, to hide the gun, Tommie Smith

7   did not see Mr. Smith when he heard the sound of the back door opening and looked out the

8   window; he only saw the officers entering the back door.

9        Mr. Smith's parole agent, Terry Johnson, also testified in support of Plaintiffs' case.  Most

10   notably, Mr. Johnson testified that an inspection of Mr. Smith's home was scheduled with Mr. Smith

11   for the very day that the events at issue took place.  As Mr. Smith was aware of the scheduled visit,

12   it seemed unlikely that he would have kept an illegal weapon in the house on that day, as Defendants

13   contended.  Defendants do not dispute that no ammunition or other guns were found in the house.

14        Plaintiffs also offered the testimony of two expert witnesses to support their case.  Peter

15   Barnett was Plaintiffs' fingerprinting expert.  He testified, *inter alia*, that it is possible for a person

16   to leave fingerprints on a firearm, that fingerprints do not fade with time, and that the Oakland

17   Police Department had run appropriate fingerprinting tests on the weapon that was allegedly found

18   on Plaintiffs' premises but that no fingerprints had been found.  Roger Clark was Plaintiffs' expert

19   on standard police procedures.  Mr. Clark testified that, if Officer Parkinson had acted consistently

20   with standard procedure, then, upon seeing Mr. Smith outside the house with a gun -- as Officer

21   Parkinson contended -- he would have detained, arrested, and handcuffed Mr. Smith before letting

22   him back into the house or at least called for back-up.  Officer Parkinson testified he did neither.

23   Instead, according to his testimony, he directed Mr. Smith back into the house without handcuffs,

24   not knowing if there might be other weapons or dangerous individuals inside and without first

25   calling for backup help.  Mr. Clark's testimony that this conduct would have been contrary to

26   standard police procedure placed the credibility of Office Parkinson in question.

27        Finally, Plaintiffs had both Defendant Officers testify in support of their case-in-chief.

28   During the examination of each officer, Plaintiffs highlighted inconsistencies in their recitation of

**United States District Court**
For the Northern District of California

1   the events as well as other problems.  Most notably, Defendant Officers claimed that, while they

2   were taking Mr. Smith to the police station in their car, Mr. Smith spontaneously confessed to

3   knowledge and possession of the gun, claiming it was not his and actually belonged to Ms. Gray's

4   brother.  But Defendants' credibility on this claim was questionable since Defendants never made

5   any mention of the alleged confession in their police report.  Moreover, neither Defendant testified

6   about the alleged confession during either of the two preliminary hearings on the criminal charges.

7   It was not until the parole revocation hearing -- which took place only after the criminal charges had

8   been dismissed twice -- that the alleged confession was brought up for the first time by Officer

9   Parkinson.

10          To be sure, Defendant Officers vehemently denied planting the gun on Mr. Smith.  At trial,

11   there was significant evidence supporting Defendants' case -- *e.g.*, the seeming unlikelihood that the

12   officers would choose to plant a semi-automatic rifle on Mr. Smith rather than, *e.g.*, a handgun or

13   contraband if their intent was to frame him, inconsistencies in Plaintiffs' testimonies, the fact that

14   the officers did not know Mr. Smith and had no reason in advance to frame him, and the fact that the

15   officers did call for a technician while they were on the scene to process the gun, a step that seemed

16   unlikely if they planted the gun.  But, ultimately, the jury found Plaintiffs' version of the events

17   more plausible than Defendants' and rendered a verdict in favor of Plaintiffs on all claims.

18                    **II.    PLAINTIFFS' MOTION TO STRIKE**

19          As a preliminary matter, the Court takes note of Plaintiffs' motion to strike the amended

20   post-trial motions filed by Defendants, in which Defendants added citations to the record not

21   contained in their original motion papers.  The Court denies the motion since it is capable of

22   reviewing the new citations in order to determine whether, as Plaintiffs contend, Defendants have

23   mischaracterized the record.  Plaintiffs have not demonstrated that they suffered any prejudice

24   thereby.

25   ///

26   ///

27   ///

28   ///

4

United States District Court
For the Northern District of California

III.   **MOTION FOR JUDGMENT AS A MATTER OF LAW OR**
**ALTERNATIVELY FOR NEW TRIAL (LIABILITY)**

A.   Motion for Judgment as a Matter of Law

1.   Legal Standard

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law.  Under Rule 50(a),

> [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on that issue, the court may:
>
> (A)   resolve the issue against the party; and
>
> (b)   grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  The motion must be made before the case is submitted to the jury and "specify . . . the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).

Under Rule 50(b), if the court denies the motion for judgment as a matter of law under Rule 50(a), "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  "A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."  Fed. R. Civ. P. 50(b), 1991 advisory committee notes; *see also* 9-50 Moore's Fed. Prac. -- Civ. § 50.43[3][a] ("A pre-verdict motion serves as a predicate to a post-verdict motion only if the pre-verdict motion includes the specific grounds asserted in the second motion.").  "Allowing trial courts to set aside jury verdicts on grounds not presented in pre-verdict motions has been held to constitute an impermissible re-examination of jury verdicts in violation of the Seventh Amendment.  [¶] In addition, the application of this rule ensures that the opposition has sufficient notice of the alleged error to permit that party to cure the defect before resting his or her case."  *Id.* § 50.43[3][b]; *see also Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (stating that this rule "preserves the sufficiency of the evidence as a question of law, allowing the district court to review its initial denial of judgment as a matter of law instead of forcing it to 'engage in an impermissible

5

United States District Court

For the Northern District of California

1  reexamination of facts found by the jury'" and further "calls to the court's and the parties' attention

2  any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to

3  correct them").

4      If there is substantial evidence to support a jury verdict, the court should deny a motion for

5  judgment as a matter of law. *See Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007)

6  ("A jury's verdict must be upheld if it is supported by substantial evidence."). "Substantial evidence

7  is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even

8  if it is possible to draw two inconsistent conclusions from the evidence." *Maynard v. City of San*

9  *Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994); *see also Wallace*, 479 F.3d at 624 ("Judgment as a matter

10 of law may be granted only where . . . the evidence permits only one reasonable conclusion, and that

11 conclusion is contrary to the jury's verdict."). Notably, "the court must not weigh the evidence, but

12 should simply ask whether the plaintiff has presented sufficient evidence to support the jury's

13 conclusion." *Id.* Moreover, "[t]he evidence must be viewed in the light most favorable to the

14 nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.* The court

15 "must disregard all evidence favorable to the moving party that the jury is not required to believe."

16 *Id.*

17      2.   Officers' Motive

18      Defendants contend that judgment as a matter of law is warranted pursuant to Rule 50(b)

19 because evidence as to their motives was admitted at trial when it should not have been. According

20 to Defendants, their motives were legally irrelevant. *See Weisgram v. Marley Co.*, 528 U.S. 440,

21 457 (2000) ("[T]he authority of courts of appeals to direct the entry of judgment as a matter of law

22 extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient

23 evidence to support the jury's verdict."). In response, Plaintiffs assert that Defendants failed to raise

24 this argument in their pre-verdict Rule 50(a) motion and that, in any event, the argument fails on the

25 merits in light of the Supreme Court's holding in *Samson v. California*, 126 S. Ct. 2193 (2006). The

26 Court agrees with Plaintiffs on both counts.

27      First, as Plaintiffs point out, Defendants never made the specific argument that their

28 subjective motives were irrelevant in their Rule 50(a) motion. Defendants contend that, although

1   they did not explicitly argue such in their Rule 50(a) motion, they nonetheless gave adequate notice

2   of the argument to Plaintiffs as well as the Court.  *See* Reply at 2 ("[T]he [C]ourt and [P]laintiffs had

3   notice of the gist of the argument."); *see also National Industries, Inc. v. Sharon Steel Corp.*, 781

4   F.2d 1545, 1549-50 (11th Cir. 1986) (noting that where Rule 50(b)'s purpose -- providing notice to

5   the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to

6   the jury -- has been met, the Eleventh Circuit "has taken a liberal view of what constitutes a motion

7   for directed verdict").  The Court does not agree.

8          At trial, Defendants argued:

9                 The basis [for the Rule 50(a) motion] is that the evidence is
                  insufficient to support their Fourth Amendment claim for an unlawful
10                search, for an unlawful arrest with regard to the search.

11                Samson versus California sets the standard as to parole
                  searches.  It is a warrant, suspicionless search, absent arbitrary,
12                capricious, or harassing *reasons*.  And the evidence does not support
                  that the officers here had arbitrary, capricious, or harassing *reasons*.
13                The case law describes that arbitrary, capricious, harassing *reasons* are
                  for things like a search that lasted too long in the middle of the night
14                because the officers had *personal animus*.  And when you have a
                  legitimate law-enforcement reason, that's the exact opposite of an
15                arbitrary, capricious, or harassing *reason*.

16                And the officers here have testified as to several legitimate
                  law-enforcement reasons. . . .So there is absolutely no evidence here to
17                support the argument or the claim that there was an unlawful parole
                  search.
18

19   RT, vol. 4, at 867-68 (emphasis added).  As is clear from the above excerpt, Defendants took a

20   position contrary to their current legal position -- *i.e.*, they denied that they were motivated by

21   arbitrary, capricious, or harassing reasons and disclaimed that they had any personal animus against

22   Mr. Smith, thus implying that subjective motive was indeed relevant.  Moreover, when the Court

23   asked the parties to provide an instruction that would give the jury guidance as to what would

24   constitute an arbitrary, capricious, or harassing search, Defendants proposed a jury instruction (to

25   which Plaintiffs agreed) that endorsed examination of an officer's subjective motive.  *See* Jury

26   Instruction No. 16 ("A search is 'arbitrary' where the officer's motivation is unrelated to

27   rehabilitative and reformative purposes or legitimate law enforcement purposes, for example, if the

28

**United States District Court**
For the Northern District of California

1    officer was motivated by personal animosity.  A search might be 'harassing' if at the whim and

2    caprice of any and all law enforcement officers.").

3         Although Defendants now claim that they "contended in their pre-trial papers and throughout

4    the trial that the officers only needed to put forward a legitimate law enforcement purpose . . . and

5    that evidence of the officers' subjective intent was not relevant," Reply at 1-2, they have failed to

6    cite to any specific pretrial filing or to any part of the trial transcript that demonstrates such.

7    Certainly, Defendants did not make this argument, nor did they rely on *Whren v. United States*, 517

8    U.S. 806 (1996), in any of the papers that they filed for the final pretrial conference or in support of

9    their Rule 50(a) motion.  Furthermore, at no time did Defendants object to any testimony about their

10   state of mind and purposes.  The Court therefore finds that Defendants waived the argument that

11   their subjective motive was irrelevant and that evidence thereof should have been excluded.

12        Second, even if Defendants' argument were not procedurally barred, it is without merit.

13   Contrary to Defendants' position, *Whren* is not dispositive of this case.  There, the Supreme Court

14   simply held that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment

15   analysis." *Id.* at 813.  In other words, once there is objective probable cause for a search, an

16   officer's subjective motive does not vitiate the constitutionality of the search; the Fourth

17   Amendment's core protection of probable cause obtains irrespective of personal motive.  But the

18   instant case does not involve a search based on probable cause.  That is, prior to going to Plaintiffs'

19   residence, there was no evidence that Defendants had probable cause to believe that Mr. Smith had

20   engaged in any criminal activity.  Indeed, Defendants do not seem to dispute that there was no

21   suspicion at all (let alone probable cause or even a reasonable suspicion) that Mr. Smith had

22   engaged in criminal activity.  Rather, Defendants went to Plaintiffs' residence to engage in a

23   suspicionless parole search of Mr. Smith.  *Whren* does not address the constitutional requisites for a

24   suspicionless search.

25        Similarly, *United States v. Knights*, 534 U.S. 112 (2001), is not dispositive of the instant

26   case.  In *Knights*, the Supreme Court simply held that an officer may have less than probable cause

27   before conducting a probation search -- more specifically, that objective reasonable suspicion for

28

United States District Court
For the Northern District of California

1   such a search is sufficient for Fourth Amendment purposes.[1]  *See id.* at 121 ("When an officer has

2   reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity,

3   there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's

4   significantly diminished privacy interests is reasonable.").  Again the core protection of the Fourth

5   Amendment -- individualized suspicion -- obtains irrespective of an officer's subjective motivation.

6   *Knights* did not address the constitutional requisites where there is no objective individualized

7   suspicion.

8        Defendants argue still that *Knights* is dispositive of the instant case based on the Ninth

9   Circuit's decision in *Motley v. Parks*, 383 F.3d 1058 (9th Cir. 2004).  In *Motley*, a Ninth Circuit

10  panel discussed the Supreme Court's holding in *Knights* as follows:

> In some parole search cases before 2001, courts held that a
> parole search was unreasonable under the Fourth Amendment because
> it was conducted for an improper or harassing *purpose* that did not
> serve the interests of parole or probation supervision.  However, in
> 2001, the Supreme Court abrogated [those cases in *Knights*], stating
> that "with the limited exception of some special needs and
> administrative search cases 'we have been unwilling to entertain
> Fourth Amendment challenges based on the actual motivations of
> individual officers.'"  Because the prohibition in *Knights* only
> prevents courts from relying on searching officers' subjective intent to
> harass when assessing the reasonableness of a search under the Fourth
> Amendment, it is clear that courts must still hold that a parole search
> is unreasonable if conducted in a harassing *manner*.

19  *Id.* at 1070 (emphasis in original).  There are two problems with Defendants' reliance on *Motley*.

20  First, the Ninth Circuit subsequently reheard the case *en banc*, and thus the panel opinion cannot be

21  cited as precedent.  *See Motley v. Parks*, 401 F.3d 1030, 1031 (9th Cir. 2005).  The subsequent *en*

22  *banc* opinion did not characterize *Knights* as the panel had.[2]  Second, as noted above, *Knights* is

---

[1]  Because this holding "rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search," the Supreme Court stated that "there is no basis for examining official purpose." *Knights*, 534 U.S. at 122.  The Court then reaffirmed what it had stated in *Whren*: "With the limited exception of some special needs and administrative search cases, 'we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers.'" *Id.* (quoting *Whren*, 517 U.S. at 813).

[2]  Furthermore, both *Motley* opinions were issued prior to the Supreme Court's decision in *Samson*, in which the Court addressed for the first time the constitutionality of a completely suspicionless parole search.

United States District Court

For the Northern District of California

1    ultimately a reasonable suspicion case, whereas the instant case does not involve reasonable

2    suspicion.  Whereas objective reasonable suspicion alone may afford sufficient constitutional

3    protection in some circumstances, the question here is what protection the Constitution requires for

4    suspicionless searches.

5            That question was finally addressed in *Samson*, 126 S. Ct. at 2193.  In *Samson*, the Supreme

6    Court addressed the issue of whether a suspicionless parole search, conducted under the authority of

7    California Penal Code § 3067(a), violates the Fourth Amendment.  *See id.* at 2196.  Relying in large

8    part on the analysis in *Knights*, which discussed the competing individual and government interests

9    involved, the Court concluded that a suspicionless parole search does not necessarily violate the

10   Fourth Amendment.  *See id.* at 2198-201.  Nonetheless, the Court did not hold such searches were

11   without any constitutional protection.  As to "[t]he concern that California's suspicionless search

12   system gives officers unbridled discretion to conduct searches," the Court stated that this was

13   "belied by California's prohibition on 'arbitrary, capricious or harassing' searches."  *Id.* at 2202.

14   Importantly, the Supreme Court cited, *inter alia*, California Penal Code § 3067(d), which provides

15   that "[i]t is not the intent of the Legislature to authorize law enforcement officers to conduct

16   searches for the sole *purpose* of harassment."  Cal. Pen. Code § 3067(d) (emphasis added); *see also*

17   *In re Anthony S.*, 4 Cal. App. 4th 1000, 1004 (1992) (stating that a search condition justifies a

18   warrantless search, but that there are exceptions, *e.g.*, "where the search exceeds the scope of the

19   consent, is conducted in an unreasonable manner, is undertaken for harassment or is '. . . for

20   arbitrary or capricious reasons'"; adding that the word "arbitrary" relates to an officer's motivation -

21   - *i.e.*, "[w]here the *motivation* is unrelated to rehabilitative and reformative purposes or legitimate

22   law enforcement purposes, the search is 'arbitrary'") (emphasis added).  Thus, pivotal to the Court's

23   permitting suspicionless searches of parolees was the safeguard that such searches may not be

24   arbitrary, capricious, or harassing -- *e.g.*, motivated by the "purpose of harassment."  Accordingly,

25   while the existence of objective probable cause or individualized reasonable suspicion may obviate

26   inquiry into subjective motives as in *Wren* and *Knights*, where there is no such objective

27   protection, parolees subject to suspicionless searches are entitled to at least protection against

28   searches initiated for arbitrary, capricious, or harassing reasons under *Samson*.  Thus, in this case

United States District Court
For the Northern District of California

1  where the parole search was not based on probable cause or reasonable suspicion, the jury was

2  properly instructed to examine the motives and intent of Officers Parkinson and Midyett to insure

3  that, at the very least, the suspicionless search was not arbitrary, capricious, or harassing.  In short,

4  this case is governed by *Samson*, not *Whren* or *Knights*.

5          Defendants try to argue that, even under *Samson*, once an officer simply *articulates* a

6  legitimate law enforcement reason for a suspicionless parole search, the search is constitutional *per

7  se* under the Fourth Amendment.  Under Defendants' construct, the mere articulation of a legitimate

8  reason ends the inquiry; a parolee would have no right to cross-examine, impeach, or otherwise

9  rebut the officer's assertion.  Defendants cite no authority for this proposition.  *Compare McDonnell

10  Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) (stating that, in the Title VII context, a plaintiff

11  alleging employment discrimination must be given a fair opportunity to show that the employer's

12  claimed nondiscriminatory reason for its action is a pretext).  Under Defendants' analysis, parolees'

13  protection against arbitrary, capricious, or harassing searches would be meaningless.  Defendants'

14  interpretation is at odds with the thrust of *Samson*.

15          Accordingly, the Court rejects Defendants' contention that they should be awarded judgment

16  as a matter of law on this basis.

17      3.      Expert Testimony

18          Defendants also contend that judgment as a matter of law is warranted because the expert

19  testimony from Mr. Barnett and Mr. Clark was erroneously admitted.  *See Weisgram*, 528 U.S. at

20  457.

21          a.      Mr. Barnett

22          According to Defendants, Mr. Barnett's testimony should have been excluded because "there

23  was *no* 'fact in issue' that [his] testimony could have helped explain because defendants did not

24  dispute that there were no fingerprints located on the assault rifle."  Mot. at 11 (adding that

25  Defendants had offered to stipulate to that fact at the pretrial conference, which would eliminate the

26  need for Mr. Barnett's testimony).  In response, Plaintiffs now argue that Mr. Barnett's testimony

27  was relevant to "issues other than that Mr. Smith's fingerprints were not on the weapon," in

28  particular, to the issue of spoliation.  Opp'n at 20.

11

United States District Court

For the Northern District of California

1    The Court does not agree with Plaintiffs' characterization of the reason why Mr. Barnett was

2    permitted to testify.  In its pretrial conference order, the Court did initially note that Mr. Barnett's

3    testimony could assist the trier of fact with respect to the issue of spoliation.  However, the Court

4    specifically reserved ruling as to whether the jury would in fact be permitted to hear evidence

5    regarding spoliation because it was not clear what prejudice Plaintiffs suffered as a result of their not

6    being able to conduct their own testing of the rifle.  *See* Pretrial Conference Order at 6.  After all, the

7    Oakland Police Department's testing failed to find Mr. Smith's fingerprints on the rifle.  At the

8    outset of trial, the Court then indicated that it might allow evidence that the gun was wiped down

9    with acetone but only to the extent necessary to explain why Mr. Barnett did not do his own

10   independent testing for fingerprints.  *See* RT, vol. 1, at 138.  At trial, the Court did not allow Mr.

11   Barnett's testimony to establish that the Police Department engaged in spoliation of evidence and

12   refused Plaintiffs' request for a jury instruction on spoliation.

13           Although Plaintiffs' current characterization of why Mr. Barnett was allowed to testify is not

14   entirely accurate, Defendants' argument is without merit.  Under Federal Rule of Evidence 702,

15   expert testimony can be admitted not only when it will assist the trier of fact "to determine a fact in

16   issue" but also when it will assist the trier of fact "to understand the evidence." Fed. R. Evid. 702.

17   Even if Defendants were willing to stipulate to the fact that no fingerprints were located on the

18   assault rifle, there was value to Mr. Barnett's testimony.  As the Court noted in its pretrial

19   conference order, "Mr. Barnett's testimony will assist the trier of fact in understanding the

20   significance of the Oakland Police Department's fingerprinting test results."  Pretrial Conference

21   Order at 6.  The significance of the test results was not just limited to the fact that no fingerprints

22   were located on the assault rifle.  Mr. Barnett confirmed (1) that it is possible for a person to leave

23   fingerprints on a firearm and that fingerprints do not fade with time, which clearly benefitted

24   Plaintiffs' case because this suggests that the lack of fingerprints may have some probative value,

25   *see* RT, vol. 3, at 654, 656-57; and (2) that appropriate fingerprinting tests had been run by the

26   Oakland Police Department, which also strengthened Plaintiffs' case -- *i.e.*, no fingerprints had been

27   found even after the appropriate testing.  *See* RT, vol. 3, at 650.  To the extent Mr. Barnett indicated

28   that conditions have to be "just right" for a fingerprint to be left on a firearm, RT, vol. 3, at 654,

United States District Court

For the Northern District of California

657-58, that it is "unusual" to get fingerprints off a firearm, *see* RT, vol. 3, at 663, and that the lack

of fingerprints did not necessarily establish that Mr. Smith did not touch the rifle, *see* RT vol., 3 at

663, that testimony actually benefitted Defendants and was not confusing.  The point is that Mr.

Barnett's testimony was admitted to help the jury understand the significance (or lack of

significance) of the fingerprint test conducted by the Police Department, a proper purpose under

Rule 702.

          b.    <u>Mr. Clark</u>

       Defendants make various arguments as to why Mr. Clark's testimony should have been

excluded.  None have merit.  As the Court indicated in its pretrial conference order, Mr. Clark's

testimony largely focused on the failure of the officers to follow standard procedures -- "*e.g.*, their

failure to arrest Marcus Belton and Juanita Walton, their failure to keep Mr. Smith's bankcard, and

their failure to include the alleged confession by Mr. Smith in the police report. . . . [T]he jury could

infer from the first two failures that the officers went to Mr. Smith's residence with the purpose of

harassing him rather than for a legitimate law enforcement purpose; they could infer from the last

failure that the officers lied about the confession."  Pretrial Conference Order at 7.  Mr. Clark's

testimony may have been questionable or problematic at times for the reasons discussed in

Defendants' motion but that was a basis for cross-examination.  They were not grounds to exclude

Mr. Clark from testifying altogether.

       The only argument by Defendants that is worth discussing is their contention that Mr.

Clark's testimony essentially constituted improper character evidence.  *See* Mot. at 14 ("[T]he jury

was allowed to infer -- improperly -- that if the officers did not comply with one practice, they

probably generally did not follow rules and would have been the type of rogue officers to plant an

assault rifle on someone.").  Contrary to what Defendants argue, Plaintiffs did not offer the officers'

specific failures to follow standard procedures as evidence that the officers generally failed to follow

standard procedures.  Rather, Plaintiffs used the evidence for a noncharacter purpose.  That is, Mr.

Clark's testimony about the standard procedure a reasonable officer would have followed upon

seeing a suspect with a gun outside his house informed the question whether Officer Parkinson had

in fact actually seen Mr. Smith in possession of a rifle.  If Officer Parkinson had, as Mr. Clark

1    indicated, acted consistently with standard procedure, he would have detained, arrested, and

2    handcuffed Mr. Smith outside the house before letting him back into the house or at least called for

3    back-up.  *See* RT, vol. 4, at 829.  As Officer Parkinson testified, he did neither but instead instructed

4    Mr. Smith to enter the house without handcuffs or any restraint, without calling back-up, and

5    without knowing whether there were other guns or armed individuals in the house.  The jury, having

6    heard such conduct would have been contrary to established procedure as testified to by Mr. Clark,

7    could well have concluded that Officer Parkinson's version of events was not credible.  Hence, Mr.

8    Clark's testimony, if believed, served a proper purpose consistent with Rule 702.

9                   4.    Disbelief in Defendants' Testimony

10         Finally, Defendants argue that, in the end, all that Plaintiffs have to support their case is

11   disbelief in Defendants' testimony.  This argument is without basis.  Plaintiffs have their own

12   testimony to support their case.  Although Defendants contend that Plaintiffs' testimony was self-

13   serving, the same can be said of Defendants' testimony.  In addition, while Defendants point to some

14   alleged inconsistencies between Plaintiffs' respective testimonies, Plaintiffs always agreed on one

15   material fact: that they never had a rifle on their premises.  Moreover, the jury could reasonably have

16   found that inconsistencies between Officers Midyett and Parkinson's testimonies were even more

17   suspect than any inconsistencies in Plaintiffs' testimony since (1) Defendants, as professional law

18   enforcement officers, were trained to make accurate observations and (2) Plaintiffs, not Defendants,

19   were the ones subjected to the shock and surprise of an unannounced search and thus more likely to

20   have suffered from impaired perceptions which could yield inconsistent testimonies as to certain

21   details.

22         Furthermore, Plaintiffs' testimony was corroborated by other evidence -- *e.g.*, Tommie

23   Smith's testimony about the events he saw and heard, the lack of any fingerprints on the gun, Mr.

24   Clark's testimony about standard police procedures, the testimony of Mr. Smith's parole agent that

25   an inspection of Mr. Smith's home was scheduled for that same day, the lack of any other guns or

26   ammunition found in the search of the house, and inconsistencies in the officers' testimony

27   (including Defendants' failure to document the alleged confession by Mr. Smith in the police report

28

United States District Court
For the Northern District of California

1  and to testify about it at the preliminary hearings).  In sum, there was substantial evidence to support

2  the jury's verdict.

3  B.    Motion for New Trial

4        1.    Legal Standard

5        Under Federal Rule of Civil Procedure 59(a), "[a] court may, on motion, grant a new trial to

6  all or some of the issues -- and to any party -- . . . (A) after a jury trial, for any reason for which a

7  new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P.

8  59(a)(1)(A).  As is clear from the above language,

9           "Rule 59 does not specify the grounds on which a motion for a new
            trial may be granted."  Rather, the court is "bound by those grounds
10          that have been historically recognized."  Historically recognized
            grounds include, but are not limited to, claims "that the verdict is
11          against the weight of the evidence, that the damages are excessive, or
            that, for other reasons, the trial was not fair to the party moving."  We
12          have held that "[t]he trial court may grant a new trial only if the
            verdict is contrary to the clear weight of the evidence, is based upon
13          false or perjurious evidence, or to prevent a miscarriage of justice."

14  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007).

15       2.    Weight of the Evidence

16       Defendants' first contention is that a new trial is warranted because the jury's verdict goes

17  against the weight of the evidence.  According to Defendants, the weight of the evidence goes in

18  their favor rather than Plaintiffs' because Plaintiffs' testimony should be discounted, containing

19  "material inconsistencies."  Mot. at 18.  This argument is not persuasive.  As noted above, Plaintiffs

20  always agreed on one material fact -- that they never had a rifle on the premises -- and there was

21  other substantial evidence supporting the verdict.  While Defendants also put on substantial evidence

22  at trial supporting their version of events, based on all the evidence of record, the Court cannot

23  conclude the jury's verdict was contrary to the weight of the evidence.

24       3.    Evidentiary Rulings

25       Defendants also assert that they are entitled to a new trial because the Court made various

26  erroneous evidentiary rulings -- more specifically, by (1) admitting Mr. Barnett's expert testimony,

27  (2) admitting Mr. Clark's expert testimony, and (3) admitting evidence of the dismissals of the

28  criminal charges against Mr. Smith.  The Ninth Circuit has instructed that "[a] new trial is only

**United States District Court**
For the Northern District of California

1    warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Ruvalcaba v.*

2    *City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

3          For the reasons discussed above, the Court's rulings on Mr. Barnett and Mr. Clark were not

4    erroneous.  Moreover, even if they were, there was no substantial prejudice to Defendants as a

5    result.  Defendants were able to cross-examine the experts.  Mr. Barnett's testimony may have, at

6    least in part, actually helped Defendants.

7          As for Defendants' argument that evidence of the dismissals of the criminal charges should

8    have been excluded, the Court already addressed that issue in its pretrial conference order.  The

9    Court held that

10                   [e]vidence of the dismissals is relevant to Officer Parkinson's motive
                     and the truthfulness of his testimony.  That is, Officer Parkinson's
11                   failure to mention the alleged confession until the parole revocation
                     hearing is arguably even more suspect once it is known that, at the
12                   time of the parole hearing, the criminal charges had already been
                     dismissed twice despite his testimony in one of the earlier hearings.  A
13                   jury could infer Officer Parkinson was especially willing to do
                     anything to make sure that Mr. Smith stayed behind bars.  However, to
14                   reduce the danger of unfair prejudice, the Court shall, at Defendants'
                     request, issue a limiting instruction as to how the evidence of the
15                   dismissals may or may not be considered.

16   Pretrial Conference Order at 9.  *Anda v. City of Long Beach*, 7 F.3d 1418 (9th Cir. 1993), does not

17   dictate a different conclusion because Plaintiffs in the case at bar did not offer evidence of the

18   dismissals to show a lack of probable cause.

19          Defendants argue that Officer Parkinson's testimony about the confession at the parole

20   revocation hearing, and not the other criminal hearings, could have been discussed "without mention

21   of the dismissals."  Mot. at 20.  However, since the jury had to be informed of the date Mr. Smith

22   was ultimately released from custody, 4½ months after the arrest and only after the parole revocation

23   hearing, the jury would likely have surmised that the criminal charges were resolved favorably.

24   Furthermore, it would have been confusing for the jury to hear about the parole revocation hearing

25   which followed closely after dismissal of the criminal charges without knowing that the criminal

26   charges had by that time been dismissed.  Finally, as noted above and as found by the Court in the

27   pretrial order, the fact of the dismissals informed Officer Parkinson's motive in testifying differently

28   at the parole revocation hearing.

United States District Court

For the Northern District of California

1    Defendants contend still that the evidence of the dismissals should have been excluded

2   because it was substantially prejudicial to them.  This argument is not persuasive.  The testimony by

3   Officer Parkinson about the dismissals was very limited, and the Court gave a limiting instruction as

4   follows:

5               Ladies and gentlemen, you have heard testimony from
            Parkinson that the criminal charges against plaintiff Torry Smith
6           arising out of his arrest on September 10th, 2004, were dismissed
            twice following preliminary hearings.

7               . . . .

8               Charges may be dismissed for a variety of reasons that have no
9           bearing on whether or not defendant officers had probable cause to
            arrest Torry Smith, or the legality of the search.  Those issues are for
10          you to decide.

11              Instead, you may only consider the dismissals of criminal
            charges against Torry Smith in assessing the credibility of John
12          Parkinson's testimony.

13  RT, vol. 3, at 722-23.  Plaintiffs' counsel did not try to use the dismissals for a purpose other than

14  that permitted by the Court.  *See, e.g.*, RT, vol. 4, at 927-28.

15    Defendants argue that the limiting instructive was no cure, citing *Arlio v. Lively*, 474 F.3d 46

16  (2d Cir. 2007), but that case is distinguishable.  There, the Second Circuit found prejudice because

17  the plaintiff was allowed to testify at length about the prior proceeding.  *See id.* at 53 ("Although the

18  district court gave a limiting instruction indicating that the testimony should be considered only for

19  the limited purpose of 'what is and what isn't claimed for damages by the plaintiff,' that same end

20  could have been achieved simply by allowing [the plaintiff] to state that he was not suing for back

21  pay.  Instead, the district court permitted [the plaintiff] to testify at length about the arbitration

22  proceeding and essentially informed the jury that [the plaintiff's] suspension was not for just

23  cause.").  Moreover, the adequacy of the Court's very specific limiting instruction is underscored by

24  the Ninth Circuit's decision in *Borunda v. Richmond*, 885 F.2d 1384  (9th Cir. 1988), where the

25  court upheld a limiting instruction on evidence of acquittal even though it should "have been more

26  narrowly tailored" because it did "constitute a limiting admonition of sorts."  *Id.* at 1388-89.  In the

27  case at bar, the limiting instruction given by the Court was unambiguous.  Indeed, Defendants did

28

1    not object to it.  They had ample opportunity to object since the Court went over the proposed

2    instruction in advance.

3          4.    Fair Trial

4          Finally, Defendants contend that they were not given a fair opportunity to present their

5    defense at trial because (1) they were not allowed to question Mr. Smith about his being a three-

6    strikes candidate, about his conduct after his release from incarceration (*i.e.*, parole violations), and

7    about his underlying conviction for armed robbery and (2) the Court interrogated defense witnesses,

8    in particular, Officer Midyett, "in a way that suggested partiality."  Mot. at 21.

9                a.    Fair Opportunity to Present Defense

10         As to the first argument, the limits imposed by the Court with respect to Defendants' ability

11   to question Mr. Smith did not create an unfair trial.

12                i.    Three-Strikes Candidate

13         The three-strikes ruling was properly based on Federal Rule of Evidence 403.  Defendants

14   argued at trial that the three-strikes prospect gave Mr. Smith a motive to lie (*i.e.*, noncharacter

15   evidence) but, as Plaintiffs pointed out, Mr. Smith already had a strong motive to lie (if in fact he

16   possessed the rifle) because his parole was subject to revocation and he was subject to criminal

17   prosecution for illegal possession of the gun.  *See* RT, vol. 2, at 360.  Moreover, any probative value

18   to the three strikes evidence was substantially outweighed by the danger of unfair prejudice.  Strikes

19   are given for serious felonies only, and thus there was a significant risk that the jury would infer that

20   Mr. Smith was a violent offender and improperly consider the evidence as character evidence.

21                ii.    Post-Incarceration Conduct

22         As to the limits on Defendants' ability to question Mr. Smith about his post-incarceration

23   conduct, that evidence was irrelevant.  While Plaintiffs did elicit testimony from Mr. Smith about his

24   employment after his release from incarceration, this was, as the Court concluded, for the limited

25   purpose of showing that "he was reemployed, which informs the question of damages."  RT, vol. 2,

26   at 230.  Plaintiff did not put on any testimony about nonmonetary damages suffered after the

27   incarceration.  Furthermore, evidence about Mr. Smith's post-incarceration conduct -- in particular,

28   his post-incarceration parole violation -- would have been unfairly prejudicial since the jury could

United States District Court

For the Northern District of California

1   have construed that parole violation as character evidence in violation of Federal Rule of Evidence

2   404(b).

3          Finally, contrary to what Defendants suggest, Plaintiffs did not open the door to Mr. Smith's

4   post-incarceration conduct because they limited their evidence to whether Mr. Smith had complied

5   with parole prior to the incident at issue.  As for Plaintiffs' counsel's closing argument, it is true that

6   counsel could have used his words at times more carefully.  *See, e.g.*, RT, vol. 4, at 937 ("There has

7   been talk about whether, because he's on parole, you know, and officers can enter at any time, and

8   he knows that -- and again, that's why he's not going to have -- it's one reason why, if you're in a

9   criminal lifestyle, it is so hard to stay out of jail, but  Torry Smith has stayed out of jail, because he's

10  not in a criminal lifestyle.  He was not in a criminal lifestyle.").  But, overall, taken in context,

11  counsel focused his closing argument on Mr. Smith's conduct prior to the incident at issue, and not

12  after.  *See, e.g.*, RT, vol. 4, at 918 ("Now, the person on parole who's in the back seat of their car --

13  he doesn't have any power in that situation."); RT, vol. 4, at 932-33 ("Now, Torry Smith established

14  himself.  He was out -- out of juvenile custody for two and a half years.  He had a job.  He worked

15  hard.  He was never violated.  Never tested dirty.  Nothing illegal was ever found in his home *until*

16  *the day* that -- until Officer Parkinson and Midyett decided to pay a visit to his home to get

17  information from him.") (emphasis added); RT, vol. 4, at 966 ("This is a young man who doesn't

18  have within his parole history of violating, of having contraband, of having weapons, of having

19  dope; but what they want you to believe is this young man had this gun in his home, and was waiting

20  *until his parole agent showed up* to hide it.") (emphasis added).

21                      iii.      Underlying Conviction

22          With respect to Defendants' inability to question Mr. Smith about the underlying conviction

23  for armed robbery, the Court properly concluded that that evidence was overly prejudicial and

24  properly excluded under Federal Rule of Evidence 403.  The risk of it being used as character

25  evidence was particularly high since the conviction was for armed robbery.  Other than use as

26  character evidence, the precise nature of the underlying conviction had no relevance to the legality

27  of the search.  Moreover, there was no evidence that Defendant Officers knew of the nature of Mr.

28

United States District Court

For the Northern District of California

1   Smith's underlying conviction prior to conducting the search.[3]  Hence, the precise nature of the

2   underlying offense did not inform the officers' motives and intent.

3       Finally, during trial, Mr. Smith never gave any testimony which would open the door to

4   evidence about the nature of the underlying conviction.  For example, Mr. Smith simply testified

5   that, from the time of his release to the date of the incident at issue, he did not possess anything

6   illegal.  *See* RT, vol. 2, at 311 ("Now, from the time of your release around April of 2002 to

7   September 10th, 2004, what were the results of your urine tests? . . . . And what were the results of

8   searches of your home? . . . . And was that -- was there ever anything illegal in your home?").  In

9   addition, he merely testified that he did not possess anything illegal on that day.  *See* RT, vol. 2, at

10  330 ("Did you possess anything illegal that day?").

11          b.    Questioning by Court

12      With respect to Defendants' second argument -- *i.e.*, that the Court improperly interrogated

13  defense witnesses -- it is likewise without merit.  Regarding Officer Midyett's testimony, the Court

14  simply struck one small portion of his testimony about what was on the audiotape and only on the

15  basis that what was said on the tape was not intelligible enough for the Court and jury to assess.  *See*

16  RT, vol. 3, at 610-11.  This can hardly be equated with an attack on or even challenge to Officer

17  Midyett's credibility.  *Cf. United States v. Martin*, 189 F.3d 547, 553 (7th Cir. 1999) (noting that

18  "[t]he occasional questioning of witnesses is one means a judge may use to assist a jury in

19  understanding the evidence"); *see also United States v. Bland*, 697 F.2d 262, 265 (8th Cir. 1983)

20  (noting that "[t]his court has always been reluctant to disturb a judgment of conviction by reason of

21  a few isolated, allegedly prejudicial comments of a trial judge" and that a trial judge is permitted to

22  ask isolated questions to "clarify ambiguities").  Certainly, it is not comparable to the attack on the

23  witness's credibility in the cases cited by Defendants.  *See, e.g.*, *United States v. Tilghman*, 134 F.3d

24  414, 418 (D.C. Cir. 1998) (in which court asked defendant, *inter alia*, "We just have to take your

25  word for it?" and "Do you think that any sane bank would give somebody a loan on figures that are

26  totally made up?  I mean, as an educated man who's been in business off and on, and government

27  _____

28      [3] The underlying conviction was a felony juvenile conviction incurred on February 9, 2000.  *See*
    Pls.' Mot. in Limine at 3.

1   business, private business.  Do you think [a] bank would give a loan to somebody on the basis of

2   figures that are just made up by the chairman of the board?" and in which court stated, *inter alia*,

3   "You were perfectly content to lose money on these contracts. . . . You were a philanthropist; you

4   wanted to help these people"); *United States v. Stover*, 329 F.3d 859, 868 (D.C. Cir. 2003) (in which

5   court asked defendant, "Is there anything you've said to this jury here today that is not the truth, the

6   whole truth, and nothing but the truth?").  In fact, the Court allowed the vast majority of what was

7   played on the tape and Officer Midyett's testimony about what was said on the tape into evidence.

8   Thus, the import of the evidence -- *i.e.*, that Defendants called a technician to the scene to test the

9   rifle for fingerprints and to recover the rifle but no technician was available -- was conveyed to the

10  jury, a fact helpful to the defense.  It tended to show that Defendants did find the rifle and sought to

11  have it analyzed.  The jury understood the significance of the testimony as evidenced by its question

12  about "stacking," as discussed below.

13          Regarding the examination of Sergeant Galindo, the Court simply decided to ask a question

14  that the jury had requested about "stacking" the requests for technician assistance and left it up to

15  the parties to elicit any additional evidence that they thought appropriate.  *See* RT, vol. 3, at 738.

16  Defendants assert in their motion that they decided for tactical reasons not to elicit further testimony

17  "because other things that the officers could have done with respect to 'securing the scene' were

18  irrelevant," Mot. at 24, but that was not their position at trial.  Rather, defense counsel specifically

19  argued for relevance (while Plaintiffs' counsel argued to the contrary): "Well, we don't think the

20  fact that a technician request was made, and that the response was that it had to be stacked, and as a

21  result, the officers decided that -- forget about it, the tech doesn't need to come, absolutely it's

22  relevant when they're making this claim that something should have been done, and it wasn't done."

23  RT, vol. 3, at 737.  In any event, even if the jury question were irrelevant, Defendants have not

24  shown how this single occurrence was so prejudicial that it rendered the trial fundamentally unfair.

25  ///

26  ///

27  ///

28  ///

IV.    **MOTION FOR NEW TRIAL AND REMITTITUR (DAMAGES)**

A.    Mr. Smith's Emotional Distress Damages

Defendants make various challenges to the $5 million award to Mr. Smith.  First, Defendants argue that Mr. Smith could only be compensated for the period from the date of his arrest to the date of his arraignment (a total of four days of incarceration) because he never pursued a malicious prosecution claim.  Second, they contend that even if Mr. Smith had asserted a malicious prosecution claim, he failed to overcome the presumption of independent judgment on the part of the prosecutor.  Third, Defendants assert that they were improperly barred from introducing evidence to challenge Mr. Smith's claim to future emotional distress damages.  Fourth, they argue that the amount of the award is excessive.  Each argument is addressed below.

1.    Malicious Prosecution

Defendants' first argument is that, based upon the claims asserted in the complaint, Mr. Smith was entitled to at most damages for the period from the date of his arrest to the date of his arraignment (a total of four days of incarceration).  In support of this argument, Defendants cite *Heck v. Humphrey*, 512 U.S. 477 (1994), in which the Supreme Court made a distinction between malicious prosecution claims and claims for false arrest or imprisonment.  The Court stated:

> "If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more."  But a successful malicious prosecution plaintiff may recover, in addition to general damages, "compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society."

*Id.* at 484; *see also Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("A cause of action for false arrest accrues at the time of detention, and 'damages for that claim cover the time of detention up until issuance of process or arraignment, but not more.  From that point on, any damages recoverable must be based on a malicious prosecution claim . . . .'"); *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181-82 (4th Cir. 1996) ("A claim of false arrest permitted the recovery of damages from '"the time of detention up until issuance of process or arraignment, but not more."'  However, allegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued, are analogous to the common-law tort of malicious

**United States District Court**
For the Northern District of California

1   prosecution."); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) ("Typically, a

2   warrantless deprivation of liberty from the moment of arrest to the time of arraignment will find its

3   analog in the tort of false arrest, while the tort of malicious prosecution will implicate

4   post-arraignment deprivations of liberty.").  In the instant case, Mr. Smith asserted a claim for false

5   arrest but not malicious prosecution.

6          In response, Plaintiffs assert that the allegations in their complaint were sufficient to put

7   Defendants on notice that they were making a claim for malicious prosecution and were seeking

8   damages for the entire period of Mr. Smith's incarceration.  Plaintiffs note that, under Ninth Circuit

9   law, "[i]n order to prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the

10  defendants prosecuted [him] with malice and without probable cause, and that they did so for the

11  purpose of denying [him] equal protection or another specific constitutional right [*e.g.*, the Fourth

12  Amendment].'"  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004).  Plaintiffs then

13  point out that, in paragraph 16 of their complaint, they alleged that "Plaintiff SMITH remained in

14  custody while he faced false felony charges . . . . The felony charges were dismissed once due to a

15  lack of evidence.  The charges were reinstated but were again dismissed at a preliminary

16  hearing . . . . Plaintiff SMITH was released from custody only after a parole revocation hearing in

17  late January 2005 resulted in dismissal of the alleged parole violation."  Compl. ¶ 16.

18         Plaintiffs' argument is not entirely convincing.  While paragraph 16 of the complaint does

19  make clear Plaintiffs' complaint was intended to encompass the entire period of incarceration and

20  not just up to the point of Mr. Smith's arraignment, Plaintiffs did not expressly plead a malicious

21  prosecution claim, nor did they request jury instructions or a special jury verdict on malicious

22  prosecution.  Nonetheless, the Court finds in Plaintiffs' favor on this issue based on Federal Rule of

23  Civil Procedure 15(b).  That rule provides that, "[w]hen an issue not raised by the pleadings is tried

24  by the parties' express or implied consent, it must be treated in all respects as if raised in the

25  pleadings.  A party may move -- at any time, even after judgment -- to amend the pleadings to

26  conform them to the evidence and to raise an unpleaded issue."  Fed. R. Civ. P. 15(b)(2).  In the

27  instant case, it was clear that Mr. Smith was seeking emotional distress damages for the entire time

28  he was incarcerated, including after the arraignment.  Defendants never objected to this claim on the

United States District Court

For the Northern District of California

1 | basis of *Heck* or similar cases, and this was not a situation in which the "evidence supporting an

2 | issue allegedly tried by implied consent is also relevant to other issues actually pleaded and tried."

3 | 3-15 Moore's Fed. Prac. -- Civ. § 15.18[1].  Indeed, the question of whether Mr. Smith could

4 | recover damages for extended incarceration given the decision of the prosecutor to bring charges

5 | was highlighted in Defendants' motion for summary judgment.  *See* Docket No. 35.  Never in the

6 | motion did Defendants make an argument based on *Heck* or similar cases or contend that the claims

7 | should be dismissed for failure to plead malicious prosecution.

8 |     In sum, because all the factual elements of a malicious prosecution claim were alleged in the

9 | complaint and it has been clear from the outset that Plaintiffs alleged that Defendant Officers

10 | fabricated evidence about the gun to falsely and maliciously cause his prosecution, the Court finds

11 | pursuant to Rule 15(b) that the parties implicitly consented to trying the unpleaded malicious

12 | prosecution claims.

13 |     As a final point, it should be noted that Mr. Smith was incarcerated not only because of the

14 | criminal charges that were filed against him but also because his alleged possession of a rifle

15 | constituted a parole violation.  In the context of parole revocation, there does not appear to be

16 | anything like an arraignment or other issuance of process; there is simply a parole revocation

17 | hearing and determination.  Thus, regardless of his criminal arraignment, Mr. Smith would have

18 | remained incarcerated (as he did after the charges were dismissed) until disposition of this parole

19 | revocation proceedings.  The *Heck* limitation, therefore, is ultimately immaterial to Mr. Smith's

20 | case.

21 |     2.     Independent Judgment of Prosecutor

22 |     Defendants' second contention is that, even if Plaintiffs did assert a malicious prosecution

23 | claim, Mr. Smith is barred from being awarded any damages that accrued after the indictment was

24 | filed, because "filing of a criminal complaint immunizes investigating officers . . . from damages

25 | suffered thereafter because it is presumed that the prosecutor filing the complaint exercised

26 | independent judgment in determining that probable cause for an accused's arrest exists at that time."

27 | *Smiddy v. Varney*, 665 F.2d 261, 267 (9th Cir. 1981) [hereinafter "*Smiddy I*"].

28 |

1    The Court notes that this precise argument was raised in Defendants' motion for summary

2    judgment and rejected.  *See* Docket No. 47, at 8-10 (order, filed on 8/9/07).  Defendants did not raise

3    this argument again in the Rule 50(a) motion at trial, nor did they seek a jury instruction on this

4    issue.  As such, it was waived.

5    Assuming, however, that the argument may properly be considered on the merits, the Court

6    rejects it for several reasons.  First, it is not clear under *Smiddy I* whether the presumption that an

7    independent judgment by the prosecutor breaks the chain of causation applies at all.  In *Smiddy I*, the

8    court held

9            that where police officers do *not* act maliciously or with reckless
        disregard for the rights of an arrested person, they are not liable for

10            damages suffered by the arrested person after a district attorney files
        charges unless the presumption of independent judgment by the

11            district attorney is rebutted.  This result is just because the other actors
        who decided to continue to hold Smiddy, the district attorney and the

12            municipal court judge, are absolutely immune from liability under
        section 1983. . . . A police officer's lot already is unfortunate because

13            it is he who often is the only actor in the chain of decisions leading to
        prosecution who is subject to section 1983 liability.  We need not

14            make it more unfortunate by holding the officer liable for damage that
        is the result of the intervening fault of others in the chain.  The

15            existence of the possibility of absolute liability on the part of the
        municipality or governmental until further underscores the justice of

16            limiting the liability of the police officers.

17    *Smiddy I*, 665 F.2d at 267 (emphasis added).

18    As is clear from above, the presumption is based on policy considerations that are informed

19    by the relative role and culpability of police officers.  Those considerations appear to justify the

20    apparent limitation on *Smiddy I*'s presumption -- it applies "where police officers do *not* act

21    maliciously or with reckless disregard for the rights of an arrested person."  *Id.* (emphasis added).  In

22    *Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991), the Ninth Circuit, citing *Smiddy I*, likewise held

23    that "police officers can be liable  . . . if they acted maliciously or with reckless disregard for [the

24    plaintiff's] rights" and "can *also* be liable if they made false reports to the prosecutor, omitted

25    material information for the reports, or otherwise prevented the prosecutor from exercising his

26    independent judgment."  *Id.* at 1136 (emphasis added).

27    Thus, *Smiddy I* and *Barlow* seem to hold that if police officers act maliciously or with

28    reckless disregard of the plaintiff's rights, and not just negligently, no presumption is created and

**United States District Court**
For the Northern District of California

25

1    hence there is no need to rebut it.  *Cf. Smiddy v. Varney*, 803 F.2d 1469, 1472 (9th Cir. 1986)

2    [hereinafter "*Smiddy II*"] ("*Smiddy I* did not authorize the district court to hold that a *negligent*

3    police investigation invariable creates an unbroken chain of causation making the officers liable for

4    all law following the arrest") (emphasis added).

5            Here, the jury rendered a verdict that Defendant Officers violated Mr. Smith's Fourth

6    Amendment rights and falsely arrested him, and necessarily found that they planted the gun on Mr.

7    Smith which led to his prosecution.  The jury also found sufficiently opprobrious conduct to warrant

8    punitive damages against Defendants.  The jury thus necessarily found that Defendant Officers acted

9    maliciously and with reckless disregard of Mr. Smith's rights.  Such a finding of such culpable

10   conduct would appear to obviate the presumption that prosecutorial independent decision breaks the

11   chain of causation.

12           Nonetheless, even if that presumption were applicable, the Court finds that that presumption

13   was, in view of the evidence at trial and the jury's verdict, rebutted as a matter of law.  There are

14   two aspects to the presumption.  First, the presumption may be rebutted if, *e.g.*, the plaintiff shows

15   that the prosecutor was pressured by the investigating officers to act contrary to her independent

16   judgment or was presented with false information or material misstatements or omissions by the

17   officers.  *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) ("[T]he presumption

18   of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials

19   who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him,

20   concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was

21   actively instrumental in causing the initiation of legal proceedings.").  Second, in order to give the

22   presumption meaningful operational effect, the courts have required the plaintiff to produce a

23   minimum quantum of evidence to rebut the presumption at least in the context of summary

24   judgment.[4]  The courts have held that rebuttal evidence cannot consist merely of a plaintiff's own

_____

26           [4] It is not clear whether this inquiry is tailored only to the summary judgment stage.  The Ninth
       Circuit cases have typically applied it in the context of summary judgment motions.  *See, e.g., Newman
27   v. County of Orange*, 457 F.3d 991, 995 (9th Cir. 2006); *Blankenhorn v. City of Orange*, 485 F.3d 463,
       473.  Arguably, once summary judgment is denied on this issue, and the case is tried to a jury, it might
28   be for the jury to resolve the ultimate factual question whether the prosecutor's independent decision
       breaks the chain of causation (*e.g.*, as a result of reliance on false evidence) free of any formulaic

United States District Court

For the Northern District of California

1 account of events which conflict with the officer's version. *See Newman v. County of Orange*, 457

2 F.3d 991, 994-95 (9th Cir. 2006); *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir. 1994).  Where

3 the plaintiff presents additional evidence that officers presented false evidence, omitted exculpatory

4 evidence, or otherwise provided material misstatements relied upon by the prosecutor, the courts

5 have found the presumption rebutted.  *See, e.g., Borunda v. Richmond*, *supra*, 885 F.2d at 1390

6 (striking omission in the police report, officers' conflicting accounts of the incident); *Barlow*, 943

7 F.2d at 1137 (police report omitted crucial information, corroborating witness, contradictory

8 accounts by police).

9      In the case at bar, assuming the presumption applies, the trial evidence and the jury's verdict

10 clearly establish that the presumption of prosecutorial independence was rebutted.  Here, the jury

11 found that the officers planted the rifle on Plaintiffs' premises, and therefore the officers' claim in

12 the police report that Mr. Smith had a firearm was false information.  *Blankenhorn v. City of*

13 *Orange*, 485 F.3d 463, 483-84 (9th Cir. 2007); *Awabdy, supra*, 363 F.3d at 1067; *Smiddy I*, *supra*,

14 665 F.2d at 266-67.

15      As to the quantum of evidence, the jury's conclusion that the officers planted the rifle was

16 not based simply on testimony by Mr. Smith and Ms. Gray.  Rather, as discussed above, there was a

17 substantial corroborating evidence, including the testimony of Tommie Smith, the contradictions

18 between the testimonies of Officers Parkinson and Midyett, the omission from the police report of

19 the alleged confession, the lack of Mr. Smith's fingerprints on the gun, the testimony that his parole

20 agent was scheduled to see him that same day, and the expert testimony of Mr. Clark which cast

21 doubt on the credibility of Officer Parkinson's version of the incident.  There can be little doubt that

22 even if the presumption applied, it was rebutted under the standards set forth in *Borunda* and

23 *Barlow*.

---

25 framework.  Arguably, so long as the evidence could support a jury's finding -- even if based solely on
the testimony of the plaintiff -- that should suffice.  Such an approach would parallel Title VII where
the shifting burdens under *McDonnell Douglas* fall out after summary judgment.  *See Costa v. Desert*
26 *Palace, Inc.*, 299 F.3d 835, 855 (9th Cir. 2002) (*en banc*) (concluding that not appropriate to introduce
*McDonnell Douglas* framework to jury ); *Sanghvi v. City of Claremont*, 328 F.3d 532, 540 (9th Cir.
27 2003) (concluded that there was error to charge jury with elements of *McDonnell Douglas prima facie*
case).  *But see Borunda*, 885 F.2d at 1390 (finding jury was entitled to find causation based on sufficient
28 evidence to rebut presumption).

United States District Court
For the Northern District of California

1    Defendants argue still that, at trial, no evidence was presented as to the basis of the district

2    attorney's decision to charge Mr. Smith, and thus there was no basis to conclude that the prosecutor

3    actually relied on the false evidence allegedly manufactured by Defendant Officers.[5]  *See* Reply at 4.

4    Plaintiffs admit that they did not offer any direct evidence as to what the prosecutor relied on, but

5    contend there was circumstantial evidence from which a jury could infer that the district attorney

6    decided to prosecute based on the false evidence of the gun procured by Defendants.  Plaintiffs note,

7    for example, that the district attorney had Defendants testify at the preliminary hearings for the

8    criminal charges asserted against Mr. Smith, a fact which further confirms the district attorney's

9    reliance on the officers' evidence.

10    While Defendants claim that that direct evidence is necessary and that circumstantial

11    evidence is never sufficient to establish the chain of causation required under *Smiddy I*, they present

12    no authority supporting that contention.  Simply because, in other cases (*e.g.*, *Blankenhorn*, 485 F.3d

13    at 483) there was direct evidence as to the basis of the prosecutor's decision, that does not mean that

14    circumstantial evidence of the prosecutor's reliance of false evidence can never be adequate.  No

15    case has so held.

16    In this case, the chain of causation between the false evidence of the gun (as found by the

17    jury) and the decision to prosecute is clear and ineluctable.  The evidence of the gun undisputedly

18    came from one source only -- Officers Parkinson and Midyett.  They were the only officers present

19    when it was allegedly found and thus were the only ones who reported it.  The criminal charges

20    ultimately brought and the parole revocation proceedings initiated were undisputedly based entirely

21    on Mr. Smith's alleged possession of the gun.  Unlike a case where there are multiple pieces of

22    evidence from multiple sources to support a charge and where it may be questioned whether the

23    prosecutor's decision was influenced by false evidence or misstatements made by an officer as

24    opposed to other evidence, the sole basis for the prosecution in this case was the gun reported by

25    Defendants.  Defendants have not asserted, and indeed cannot assert, that the evidence of the gun

26

27    ───────────────

     [5] In contrast, in the motion for summary judgment, the Court had before it the deposition of
28    Officer Williams, who discussed, *inter alia*, presentation of the case to the district attorney.  *See* Docket
     No. 36 (Lee Decl., Ex. C).

United States District Court
For the Northern District of California

1  could have come from any source other than Officers Parkinson and Midyett.  *Cf. Barlow*, 943 F.2d

2  at 1137 (prosecutors had only the arresting officers police report available to him).  As Plaintiffs

3  point out, that the district attorney chose to have Defendants testify at the preliminary hearings

4  underscores this fact.  In the instant case, Defendants' wrongful conduct of falsely reporting a gun

5  found on Mr. Smith was undoubtedly and as a matter of law "actively instrumental in causing the

6  initiation of legal proceedings" by the district attorney.  *Awabdy*, 368 F.3d at 1067.

7       As a final point, it is worth noting that Defendants can hardly argue that the trial was not fair

8  (and thus a new trial warranted) because of the issue of independent prosecutorial judgment.

9  Although they raised the issue in moving for summary judgment,  they never argued at trial for

10  judgment as a matter of law on this basis, nor did they ask for a jury instruction or a special verdict

11  to distinguish pre-arraignment from post-arraignment damages.

12       3.   Future Emotional Distress Damages

13       Finally, Defendants argue that Mr. Smith's emotional distress award was "flawed [because

14  the jury instructions allowed] the jury . . . to consider how his putative constitutional injuries might

15  affect him in the future" but Defendants were "prevented from presenting evidence that would have

16  mitigated plaintiff's claim to future damages" -- *i.e.*, that he violated parole again after the incident

17  at issue. Mot. at 9.  This argument is not persuasive because (1) Defendants point to no evidence

18  demonstrating that Plaintiffs presented any evidence as to Mr. Smith's future emotional distress

19  damages or sought such from the jury and (2) Defendants did not object to the jury instruction, thus

20  waiving their challenge.

21       4.   Amount of the Award

22       Finally, Defendants challenge the $5 million emotional distress award to Mr. Smith as

23  excessive and unsupported by evidence.  When a court reviews for excessiveness, a jury's finding on

24  the amount of damages should be reversed only if the amount is "grossly excessive or monstrous,"

25  *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir.2003) (internal quotation

26  marks omitted), or if the amount "shocks the conscience."  *BMW of North America, Inc. v. Gore*,

27  517 U.S. 559, 568 (1996).

28

United States District Court

For the Northern District of California

1   The evidence presented at trial and viewed in Plaintiffs' favor could justify a substantial

2   verdict.  "Compensatory damages may be awarded for humiliation and emotional distress

3   established by testimony or inferred from the circumstances, whether or not plaintiffs submit

4   evidence of economic loss or mental or physical symptoms."  *Johnson v. Hale*, 13 F.3d 1351, 1353

5   (9th Cir. 1994).  The testimony of the plaintiff alone can substantiate a jury's award of emotional

6   distress damages.  *See, e.g.*, *Zhang*, 339 F.3d at 1040; *see also Passantino v. Johnson & Johnson*

7   *Consumer Prods., Inc.*, 212 F.3d 493, 513-14 (9th Cir. 2000).

8   Plaintiff presented evidence that Mr. Smith was naked in bed when the police entered the

9   house from both the front and back doors with weapons drawn.  The officers forced Mr. Smith at

10  gunpoint into a prone position on the bed and handcuffed him.  *See* RT, vol. 2, at 324.  The officers

11  did not tell Mr. Smith why they were there and simply interrogated Mr. Smith about other crimes of

12  which he had no knowledge.  Only after interrogating him and holding him at gunpoint did they tell

13  Mr. Smith that they had found his bank card in the car of a known criminal.  *See* RT, vol. 2, at 326.

14  After the police searched the house, Mr. Smith was taken outside to a waiting police car.  Mr.

15  Smith's mother, Tommie Smith, Ms. Gray, Ms. Gray's children, and all the neighbors saw him

16  being taken away.  *See* RT, vol. 2, at 329.  Mr. Smith was distressed in particular that his mother had

17  to witness his arrest.  *See* RT, vol. 2, at 329.  He even told Tommie Smith to take his mother away

18  since "[h]e didn't want her to see him in that situation."  RT, vol. 2, at 209.

19  Riding in the police car, Mr. Smith still did not know precisely why the police had entered

20  and searched his home and held him at gunpoint.  It was not until he was being booked for

21  possession of a weapon that he learned that he was being arrested because the police had planted a

22  rifle at his residence.  Mr. Smith was nervous and frightened not only because he had never been

23  charged as an adult before, *see* RT, vol. 2, at 333, 335-336, but also because the charge was a serious

24  one and he did not know what sort of prison time he would be facing.  *See* RT, vol. 2, at 335.

25  Moreover, criminal charges aside, the officers' claim that he had an assault rifle in his possession

26  meant that his parole could be revoked.

27  Mr. Smith's nervousness and fear were heightened as the criminal and parole revocation

28  hearings proceeded against him.  At each proceeding, one of the officers was there pressing forward

United States District Court

For the Northern District of California

1    with the lie that they had found an assault rifle at Mr. Smith's house.  Moreover, new lies were then

2    told to insure that he would not be released.  At the parole revocation hearing, Officer Parkinson

3    testified for the first time that Mr. Smith had "confessed" that the assault rifle was his while he was

4    being transported to the police station.  Mr. Smith feared the Defendants' continuing false

5    allegations against him:

6              I've got this officer at every hearing I'm at, or whatever I'm doing.
               This officer is always there.  And he's lying on the witness stand about
7              me carrying a weapon, and -- and about his reasons for coming to my
               home.  And these are supposed to be respected officers that we -- that
8              supposed to protect and serve our community, but I mean, what I'm
               going through with officers, I'm actually scared.  I'm confused.  I
9              don't know what to feel, but I definitely know I was scared though.

10   RT, vol. 2, at 343.

11             Ultimately, Mr. Smith was incarcerated for 4½ months because of Defendants' actions.  Mr.

12   Smith testified that "it was not a pleasant stay.  I stressed every day.  I cried.  I tried to laugh, but it

13   wasn't easy, because I was confused."  RT, vol. 2, at 339-40.  He spent the holidays in jail and

14   without any contact with family members.  See RT, vol. 2, at 342.

15             There was evidence presented at trial that, as a result of the wrongful actions of Defendants,

16   Mr. Smith lost his job, his family, his furniture, and his home, and his relationship with his girlfriend

17   of nearly a year and a half became unstable.  See RT, vol. 2, at 346.  Mr. Smith testified that his life

18   that he had worked so hard to put back on track was shattered:

19             To see that in one day, in a matter of ten, fifteen minutes, your life
               could be ruined based on somebody else want to take the law in they
20             own hands, and if you don't give them what they want, they can
               actually take your life away from you.
21

22   RT, vol. 2, at 346.

23             While the evidence thus supports a significant emotional distress award, the question is

24   whether the $5 million award is grossly excessive, monstrous, or shocks the conscience.

25             In making that assessment, the Court draws some guidance from awards granted in similar

26   cases.  The Court acknowledges, however, that the Ninth Circuit has expressly stated that, "[w]hile

27   analogies to, and comparisons with, other cases may be helpful on many types of issues, their

28

31

United States District Court

For the Northern District of California

1   usefulness on questions of damages is extremely limited." *Mattschei v. United States*, 600 F.2d 205,

2   209 (9th Cir. 1979).

3        Defendants rely for the most part on *Limone v. United States*, 497 F. Supp. 2d 143 (D. Mass.

4   2007), where the plaintiffs were originally sentenced to death by electrocution or life imprisonment

5   based on false testimony from FBI agents and "malicious prosecution, negligence and conspiracies

6   engaged in by the government."  According to Defendants, *Limone* establishes that there is a

7   "national consensus" that wrongful imprisonment is valued at approximately $1 million a year.

8   Mot. at 10.  That argument mischaracterizes *Limone*.  In *Limone*, the court stated that a wrongfully

9   imprisoned plaintiff was entitled to compensation of "*at least* $1 million per year of imprisonment*."

10  *Limone*, 497 F. Supp. 2d at 243-44 (emphasis added).  In other words, the court in *Limone*

11  articulated a floor for wrongful imprisonment awards, not a ceiling.  Also, the court in *Limone*

12  emphasizes that awards should be based on the particular suffering of the plaintiff in each case,

13  which can be especially difficult to quantify in cases involving wrongful imprisonment and the

14  accompanying "shock and horror of arrest and convictions . . . the setting in of despair, or the

15  withering of relationships."  *Id.* at 243-244.  The court further noted the intensity of degree of injury

16  could vary over time, depending upon the circumstances.  Ultimately, the court awarded

17  approximately $1 million per year for periods of wrongful incarceration that spanned dozens of

18  years for each of several plaintiffs.

19       As the court in *Limone* noted, a number of verdicts of approximately $1 million per year

20  have been awarded in cases involving periods of wrongful incarceration which span a significant

21  amount of time.  *See Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003), *cert. denied*, 539 U.S. 943,

22  123 S. Ct. 2621, 156 L. Ed. 2d 630 (2003) ($15 million in compensatory damages for malicious

23  prosecution that resulted in 15 years' imprisonment, equivalent to $1 million per year); *Bravo v.*

24  *Giblin*, No. B125242, 2002 Cal. App. Unpub. LEXIS 10494, at *74 (Nov. 18, 2002) ($3,537,000 for

25  1,179 days of incarceration at the rate of $3,000 per day or $1,095,000 per year, in addition to $1

26  million for emotional damages suffered prior to sentencing).  Where the period of incarceration is

27  shorter (*e.g.*, less than one year), proportionately larger awards (measured by annualizing the award)

28  have been rendered, presumably reflecting *Limone*'s observation that the injury from incarceration

United States District Court

For the Northern District of California

1   may be more intense towards the beginning.  *See, e.g.*, *Ramirez v. Los Angeles County Sheriff's*

2   *Office*, No. 2:04-cv-06102-GAF-FMO, 2006 WL 1428310 (C.D. Cal. Feb. 16, 2006) (awarding $18

3   million in compensatory damages for malicious prosecution that resulted in ten months'

4   incarceration)[6]; *Jones v. City of Chicago*, No. 83 C 2430, 1987 U.S. Dist. LEXIS 10510, at *1 (N.D.

5   Ill. Nov. 10, 1987) (awarding $71,100 for false arrest; $71,100 for intentional infliction of emotional

6   distress; $355,500 for false imprisonment; and $213,300 for malicious prosecution" resulting in one

7   month's imprisonment -- damages annualized at $8,532,000 per year), *aff'd*, 856 F.2d 985 (7th Cir.

8   1988).

9        In a few cases, courts have reviewed verdicts for excessiveness.  Two involve factual

10   scenarios similar to the instant case in which a plaintiff was wrongfully imprisoned for a limited

11   period of time.  *See Pitt v. District of Columbia* 404 F. Supp. 2d 351 (D.D.C. 2005) (upholding jury

12   verdict for $100,000 in compensatory damages where plaintiff alleged that he was wrongfully

13   arrested and prosecuted despite overwhelming evidence of his innocence, resulting in incarceration

14   for ten days in a halfway house), *aff'd part and rev'd in part on other grounds*, 491 F.3d 494

15   (D.C. Cir. 2007); *Wagenmann v. Pozzi*, No. 79-1658-F, 1986 U.S. Dist. LEXIS 30752 (D. Mass. Jan.

16   7, 1986) (remitting jury award from $1.6 million to $100,000 in compensatory damages -- $50,000

17   of which was attributable to emotional distress -- where plaintiff alleged that several police officers

18   conspired among themselves and with others to violate his civil rights, resulting in his arrest and 36

19   hours of detention in custody and at a state mental hospital for observation).  However, the courts

20   did not explain their reasons for upholding or remitting the awards beyond a statement that they

21   were or were not excessive in light of the evidence presented at trial.  *See Pitt*, 404 F. Supp. 2d at

22   356; *Wagenmann*, 79-1658-F, 1986 U.S. Dist. LEXIS 30752 at *17.

23        The above case law provides some, but limited guidance, as to the range of verdicts rendered

24   in prior cases involving wrongful incarceration.  In determining whether the $5 million in this case is

25   grossly excessive or monstrous, the Court, takes this range into account, but focuses primarily on the

26   _____

27        [6] The *Ramirez* verdict is reported to have been the largest in the history of the L.A. Sheriff's
Dept. for an individual civil rights case.  *See* Natalie White, "Federal jury awards teacher record $18M

28   against L.A. County Sheriff," *Daily Record*, Mar. 18, 2006.

1    facts of this particular case.  The award to Mr. Smith compensated him for the emotional distress

2    caused by his loss of his freedom for 4½ months, the indignity of having to defend himself against

3    trumped-up criminal charges and parole revocation proceedings, the uncertainty and apprehension

4    about his fate and future caused by the false arrest and evidence, and the loss of his house and

5    relationship with Ms. Gray.  Mr. Smith also suffered distress from the unlawful search itself, being

6    held at gunpoint while naked and without knowing the basis of the search.  These injuries are

7    profound and warrant a substantial verdict.

8          Nonetheless, the $5 million verdict for 4½ months of incarceration represents an annualized

9    award of over $13 million.  Such an award, well beyond nearly each of the awards for wrongful

10   incarceration catalogued in *Limone*, is grossly excessive.  The facts, while compelling, do not

11   warrant such an extraordinary result.  For instance, Mr. Smith was not on death row, *see Limone*,

12   497 F. Supp. 2d at 143, nor was he stigmatized by a wrongful conviction of *e.g.*, rape.  *Cf. Bravo*,

13   2002 Cal. App. Unpub. LEXIS 10494.  Although he had a relationship with Ms. Gray, he was not

14   deprived of consortium with a spouse and his children.  *Cf. Limone*, 497 F. Supp.2d at 143.  The

15   Court therefore grants a new trial on Mr. Smith's general damages unless he accepts a remittitur

16   reducing his emotional distress award from $5 million to $3 million.

17   B.    <u>Mr. Smith's Lost Wages</u>

18         Defendants contend that they are also entitled to a new trial on the lost wages award or that

19   the Court should remit the award to $0 because there was no evidence to support the award.  The

20   Court does not agree that there should be a remittitur to $0.  During trial, Mr. Smith testified that, at

21   the time of the incident, he was working for Pep Boys part-time -- approximately eight to ten hours -

22   - and that he earned $10 an hour.  *See* RT, vol. 2, at 303, 350.  Although Defendants point to

23   inconsistencies in Mr. Smith's testimony, including his admission that he drew unemployment

24   insurance, and contend he was not credible, they did not establish at trial that it was impossible to

25   draw unemployment while working reduced hours.  Nor did they establish there was no substantial

26   evidence to support a jury finding that Mr. Smith lost some wages as a result of the arrest and

27   incarceration.  Therefore, based on the trial evidence, an award of $1,800 would have been justified

28   (*i.e.*, $10 x 10 hours/week x 4 weeks x 4.5 months = $1,800).  An additional amount might have

United States District Court

For the Northern District of California

1    been justified based on Mr. Smith's testimony that he had a "small clientele" doing auto mechanic

2    work on the side, (*see* RT, vol. 2, at 303), but Mr. Smith provided no specific evidence as to the

3    amount.

4            Plaintiffs argue that the jury could have calculated the $8,000 lost wages award based on a

5    forty-hour work week instead of a ten-hour work week because Mr. Smith testified at trial that "his

6    hours had been cut to 8-10 hours a week in the late summer of 2004 due to a slow down at work.

7    Therefore, a reasonable inference that could be drawn from this testimony was that Mr. Smith would

8    more likely than not have returned to full time employment when work picked up at Pep Boys."

9    Opp'n at 8.  The Court does not agree with Plaintiffs' characterization of Mr. Smith's testimony.  At

10   trial, Defendants cross-examined Mr. Smith with a statement in his deposition in which he stated

11   that he worked at Pep Boys "I believe from March to March, but I got laid off approximately about

12   two weeks.  And then I got rehired to come back in, because hours were slow.  And I continued to

13   work there until I went to jail for this committed offense -- I mean, for this case that we're filing a

14   lawsuit for now."  RT, vol. 2, at 349.  Mr. Smith's deposition testimony explains why he was

15   working only part-time and not full-time, but there was no evidence presented to the jury that work

16   did pick up or likely would have picked up at Pep Boys.  Hence any finding that Mr. Smith would

17   have worked full time during the period of his incarceration was speculative.

18           Accordingly, the Court conditionally grants Defendants' motion for a new trial on the lost

19   wages award.  The grant is conditioned on Mr. Smith's refusing to accept a reduced award of $1,800

20   (instead of $8,000) in lost wages.  If Mr. Smith does not accept the remittitur, Defendants will be

21   entitled to a new trial on lost wages.

22   C.     Ms. Gray's Emotional Distress Damages

23           Defendants challenge first the emotional distress award of $750,000 to Ms. Gray.  According

24   to Defendants, the award was not supported by the evidence and further was excessive such that the

25   damage award should be remitted or a new trial held.

26           As noted above, evidence was presented that Ms. Gray and Mr. Smith were resting naked in

27   their bedroom when there was a knock at the door.  Ms. Gray went to the door to check who was

28   there and was told through the door that it was the police.  She returned to the bedroom to put on a

35

United States District Court

For the Northern District of California

1   robe but, before she could open the door, Defendants (as well as another officer) entered the house --

2   both from the front and back and with their weapons drawn.  *See* RT, vol. 2, at 385.  There was no

3   evidence that Defendants pointed their guns at Ms. Gray herself, although they did hold Mr. Smith at

4   gunpoint.  Ms. Gray, who had never been arrested or charged with a crime and is nervous around

5   weapons, had no idea why the police were there.  *See* RT, vol. 2, at 386, 406.  At no point was Ms.

6   Gray given an explanation as to what was going on.  Furthermore, the police separated Ms. Gray

7   from Mr. Smith and did not permit her to use the telephone.  *See* RT, vol. 2, at 389-90.  Ms. Gray

8   was told to leave her home and wait outside, where her family and neighbors witnessed the search

9   and Mr. Smith's arrest.  *See* RT, vol. 2, at 329, 389-90.  After being readmitted to the house, Ms.

10  Gray was allowed to change from her robe into clothes, although Defendants told her to keep the

11  bathroom door open while she changed.  *See* RT, vol. 2, at 389, 406-07.

12          Ms. Gray testified that, during the event at issue, she was scared and shaken and about to cry,

13  not only because of what was happening but also because of what might happen to Mr. Smith and

14  because of what might happen to her and her children in the future without Mr. Smith, who paid for

15  half the bills and was a figure in the her children's lives.  *See* RT, vol. 2, at 393.  Then, in the wake

16  of Mr. Smith's arrest and the revelation that the police had planted a gun, Ms. Gray had to deal with

17  losing her home and furniture, seeing Mr. Smith wrongfully incarcerated, and having an unstable

18  relationship with Mr. Smith.  *See* RT, vol. 2, at 346.

19          Although the above evidence undoubtedly establishes that Ms. Gray suffered significant

20  emotional distress, there was no evidence at trial that the Defendant Officers used excessive force

21  against Ms. Gray or otherwise abused her verbally or physically.  There was no evidence that they

22  held her at gunpoint or caused her to fear for her physical safety.  Nor was there any evidence that

23  the Defendant Officers engaged in a destructive, reckless, or prolonged search of the residence.

24  Although she was required to keep her bathroom door open when she was permitted to dress, there

25  was no evidence that she was in view of the officers.  In contrast to the testimony by Mr. Smith, who

26  testified as to the distress inflicted not only on the day of the raid but also that suffered during his

27  4½ months of incarceration, Ms. Gray's testimony focused on her fear and distress on the day of the

28  search.  *Cf. Mendez v. County of San Bernardino*, No. CV 04-7131 GPS (RCx), 2005 WL 5801540

United States District Court

For the Northern District of California

1  (C.D. Cal. Nov. 22, 2005) (awarding plaintiff $2 in compensatory damages for false arrest and

2  illegal search where she had not meet her burden of proving that she suffered any emotional distress

3  from the violation of her constitutional rights after the date of the incident and was not entitled to

4  jury instruction that would have allowed the jury to speculate about possible emotional distress

5  damages after that date).  Importantly, Ms. Gray, in contrast to Mr. Smith, did not suffer the distress

6  of actual incarceration for 4½ months or the fear and uncertainty of pending criminal and parole

7  revocation charges based on false evidence and the potentially grave consequences therefrom.

8       The evidence of magnitude and intensity of Ms. Gray's distress, particularly on the day of

9  the search, was substantial.  But the Court finds that the $750,000 award is grossly excessive based

10  on the facts of this particular case.  The award appears to be of a different magnitude compared to

11  other awards for unreasonable searches.  *See Frunz v. City of Tacoma*, 468 F.3d 1141 (9th Cir. 2006)

12  (upholding jury award of $27,000 in compensatory damages to homeowners for distress caused by

13  police officers unlawfully entering and searching home and use of excessive force by one officer,

14  including holding gun to homeowner's head); *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.

15  1991) (awarding family members compensatory awards ranging from $1 to $20,000 for

16  unreasonable search where officers entered home by force despite not having a no-knock warrant,

17  "physically and verbally mistreated members of the family," and left the home "turned upside

18  down"); *see also Bloom v. City of Scottsdale*, No. 91-15472, 1992 WL 258883 (9th Cir. Oct. 2,

19  1992) (unpublished decision) (affirming jury award of $50,000 to plaintiff, a 12 year-old girl, for

20  emotional distress resulting from warrantless and unreasonable search of her home, where plaintiff

21  introduced evidence she suffered emotional distress as a result of the incident and continued to have

22  difficulty dealing with police; overturning$25,000 award to plaintiff's 16-year old brother, stating

23  that he did not testify he suffered emotional distress.); *cf. Joan W. v. City of Chicago*, 771 F.2d 1020

24  (7th Cir. 1985) (remitting award to  woman subjected to an unreasonable strip search from $112,000

25  to $75,000, and noting that similar strip search suits in the city had resulted in jury awards ranging

26  from $3,000 to $60,000).

27       Thus, the Court finds the award of $750,000 to Ms. Gray grossly excessive.  The Court

28  conditionally grants a new trial on Ms. Gray's compensatory damages.  That grant is conditioned on

United States District Court
For the Northern District of California

1  Ms. Gray's refusing to accept a reduced award in the amount of $300,000.  If Ms. Gray does not

2  accept the remittitur of $300,000 (reduced from $750,000), Defendants will be entitled to a new trial

3  on her compensatory damages.

4  D.       Punitive Damages and Civil Penalty

5          Finally, Defendants summarily challenge the punitive damages and civil penalty awarded by

6  the jury.  That challenge is rejected.  First, Plaintiffs did not have to prove by clear and convincing

7  evidence as, Defendants contend, that they were entitled to punitive damages for the federal claims.

8  All they needed to show under federal law was a preponderance of the evidence.  Second, the jury's

9  verdict undoubtedly reflected its belief that the officers did in fact plant the rifle on Mr. Smith.  Such

10  a finding supports the conclusion that the officers did in fact act maliciously and willfully.  The

11  jury's conclusion that the rifle was planted was not contrary to the clear weight of the evidence, for

12  the reasons stated above.

13                            **V.    CONCLUSION**

14          For the foregoing reasons, Defendants' post-trial motion on liability is denied, and their post-

15  trial motion on damages is granted in part and denied in part.

16          This order disposes of Docket Nos. 142-44.

17

18          IT IS SO ORDERED.

19

20  Dated:  March 17, 2008

21                                            EDWARD M. CHEN
                                              United States Magistrate Judge
22

23

24

25

26

27

28